Per Curiam:
This case comes before the court on defendant’s motion, filed July 19,1976, pursuant to Rule 141 (b) moving that the court adopt the recommended decision of Trial Judge John P. Wiese, filed June 9, 1976, pursuant to Rule 134 (h), as the basis for its judgment in this case since plaintiffs have filed no notice of intention to except thereto and the time for so filing pursuant to the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the said recommended decision, as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, defendant’s motion of July 19, 1976, is granted,
Wiese, Trial Judge: The corporate plaintiffs involved in this tax refund suit were assessed the surtax that is imposed
OPINION OP TRIAL JUDGE
Wiese, Trial Judge:
The corporate plaintiffs involved in this tax refund suit were assessed the surtax that is imposed *74 by Sections 531-32 of the Internal Revenue Code of 1954[1] on every corporation “formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed.” After payment of the tax (together with interest measured from the return due date for the particular years involved), timely administrative claims for refund were filed. These asserted that the earnings against which the tax had been imposed represented accumulations earmarked for a reasonable business need, to wit: the intended redemption of the shares of a stockholder who held a 50 percent interest in each of the two corporations. The Commissioner of Internal Revenue rejected the refunds on the basis claimed. We do also. Specifically, the conclusions reached here are: (i) the redemption in question satisfied only a personal aim of the shareholder rather than a reasonable business need of the plaintiffs; (ii) the proof offered failed to overcome, by the required preponderance of evidence, the statutory presumption of Section 533(a) that earnings and profits, when accumulated beyond the reasonable needs of the business, the case here, “shall be determinative of the purpose” to avoid income tax with respect to shareholders; and (iii) the deficiency interest, paid for the period extending from the due date of the corporate tax returns to the later date of notice and demand by the Government, is not recoverable for failure to raise this issue in the administrative claims for refund.

I. Facts

**

Plaintiffs, John B. Lambert and Associates — Cleveland Agency, Inc. (hereinafter the Cleveland Agency or taxpayer) and John B. Lambert and Associates — Northeastern Ohio Agency, Inc. (hereinafter the Northeastern Agency or taxpayer) , are Ohio corporations actively engaged in the business of selling and servicing health, accident, life and similar *75 forms of insurance. John B. Lambert is president and chief executive officer of both corporations; he has served in this capacity continuously since the establishment of the corporations in 1959. Margaret M. Lambert is John B. Lambert’s wife; she was employed as the vice-president of the Cleveland Agency from the time of incorporation until 1967. During the tax years in issue in this case, 1967-68, Mr. and Mrs. Lambert each owned a half interest in the plaintiff corporations and, consequently, together they constituted all of the plaintiffs’ shareholders.
The insurance business of the plaintiff corporations began as a partnership between the Lamberts in Tucson, Arizona in 1932. In 1935, the partnership moved to Phoenix, Arizona, and then, in 1945, the business relocated once again, this time to Cleveland, Ohio. On January 2, 1960, the partnership was divided. The insurance business then being conducted in the Cleveland area was taken over by the plaintiff, Cleveland Agency, a corporation then newly organized for that purpose ; the business in the outlying areas was 'absorbed by the plaintiff, Northeastern Agency, likewise a then newly organized corporation.
In the five-year period immediately following the move to Cleveland (1945-50), the business experienced its greatest growth. During this time, it expanded its territory to include 14 contiguous counties in Northeast Ohio, it opened seven separate offices, and, at one point in this period, employed as many as 127 sales personnel. Following incorporation in 1959 and until approximately 1969, the business stabilized. No new offices were added, the sales staff was reduced to approximately 100 salesmen, and, through 1967, only two offers were made to acquire other agencies, neither of which proved successful. After 1969, the business declined to some degree.
During the period of rapid growth (1945-50), expansion was financed entirely from profits derived from the business. Debt financing was never required. In fact, at no point during the entire partnership period, nor even during the later years of incorporation preceding the redemption of Margaret Lambert’s shares in December 1969, did the business ever incur any long-term debt. All business objectives, growth included, were pursued on a cash only basis — a managerial *76 policy that reflected the fiscal conservatism of the chief executive, John Lambert.
During the years of partnership, the profits derived from the business were shared equally between the Lamberts. Over this same period, however, Mrs. Lambert’s role in the business was one of gradually lessening participation. Initially, that is, while the business was still located in Tucson, Arizona, her responsibilities included office administration and bookkeeping and Mr. Lambert was responsible for insurance sales and service. However, with the growth of the business administrative personnel were added and Mrs. Lambert’s functions became more supervisory in nature requiring less, on her part, in the way of involvement in the everyday affairs of the business. Additionally, with the developing success of the business, commitment to the raising of her family and the pursuit of other nonbusiness interests became matters of greater concern to Mrs. Lambert. Thus, by the time incorporation was decided upon in 1959, Mrs. Lambert was no longer routinely involved in everyday partnership matters but she did, however, continue to involve herself in discussions bearing upon matters of major importance to the business.
The gradual withdrawal of Mrs. Lambert from the concerns of a daily business routine was accompanied also by a gradually changing attitude on her part towards continued growth of the business. Whereas Mr. Lambert retained a commitment to expansion well beyond the time of initial incorporation, Mrs. Lambert, on the other hand, had long since felt much the other way. Beginning in the late 1940’s, she had begun to question, on a personal level, the need for, as well as the wisdom of, further growth. By stages, this questioning of the continuing pursuit of further growth intensified to the point of disenchantment with the business in general so that, by 1959, she no longer wanted to be involved with the business to any degree. Finally, in 1967, her desire to be free of concern and to have time and money for travel led her to request the redemption of her shares in the two corporations.
The request for redemption was informally acceded to by the corporations and, by way of implementation of this goal, *77 a request for ruling was submitted to the Internal Revenue Service. Simultaneously, but again on an informal basis, it was decided that the redemption would be carried out either upon the receipt of a favorable ruling from the Internal Revenue Service or upon the expiration of 10 years from the date of initial incorporation, whichever might first occur.[2]
The requested ruling did not materialize and on December 29, 1969 — 10 years after the date of initial incorporation — the parties executed redemption agreements which provided that Mrs. Lambert would receive $130,000 for her stock in the Cleveland Agency and $177,000 for her stock in the Northeastern Agency. Payment, in each case, was to be accomplished through six annual installments subject to interest of 4 percent on all unpaid balances.
Throughout their existence, Mr. Lambert was the principal decision maker with regard to determining corporate cash management policies. By virtue of their adherence to his business philosophy, the corporations sought to maintain a strong cash position, and, in keeping with this, historically paid small dividends, never exceeding $250 per year per corporation. Consequently, in the three-year period immediately preceding execution of the redemption agreements in 1989, there were no distributions of earnings and profits except for the indicated minimum dividend of $250. During this same period plaintiffs had net income, after payment of federal taxes, in the following amounts:

In addition to their retention of the net earnings listed above, the plaintiffs’ prior year accumulations, as reflected *78 in net liquid 'assets (meaning current assets less current liabilities [3]) were in the following amounts:

On audit of the Cleveland Agency s federal income tax return for the year 1968, and of the Northeastern Agency’s returns for the years 1967 and 1968, the Commissioner of Internal Eevenue assessed an accumulated earnings tax. As noted, the basis for refund of the tax ('and the interest that was paid therewith) is the contention that there existed a reasonable business need to accumulate earnings and profits, namely, payment for the redemption of the shares of a 50 percent stockholder.

II. Discussion

A. The purpose of the accumulated earnings tax is to discourage the use of a corporate entity as the means of avoiding personal income tax of shareholders through nondistri-bution of earnings and profits. The aim of the tax “is to compel the company to distribute any profits not needed for the conduct of its business so that, when so distributed, individual stockholders will become liable” for taxes on the dividends received. Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 699 (1943). Accordingly, the tax is imposed upon any corporation (other than a personal holding company or a corporation exempt from federal income tax [4]) which is formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed. Section 532. If a corporation accumulates earnings and profits in excess of *79 its reasonable business needs, the forbidden purpose is presumed to be present unless the corporation proves otherwise by a preponderance of the evidence. Section 533.
In determining accumulated taxable income for any year,[5] Section 535 allows as a deduction from taxable income, inter alia, an accumulated earnings credit for that portion of the earnings and profits retained for the reasonable needs of the business, with a minimum allowable accumulation over the life of the corporation of $100,000. Moreover, Section 537 provides that reasonable needs of the business include “reasonably anticipated needs.”
Thus, there will be no accumulated earnings tax on a corporation to the extent that it can show that an accumulation was for the reasonable needs of its business (present or anticipated), and, in all events, there will be no such tax on an accumulation which, when added to the lifetime accumulation, does not exceed $100,000.
The statutory considerations identified above define the threshold issue in this case: whether the retention of earnings and profits during the years in issue represented accumulations required for reasonable needs of the business. By way of answer, we begin with the point on which the parties agree, namely, that under certain circumstances, for example, to promote corporate harmony, efficiency of management or to enable a corporation to continue its accustomed practices or policies, an accumulation of earnings to fund a stock redemption may constitute an accumulation for a “reasonable need of the business” within the meaning of Sections 535(c) and 537. This much is not debated. Where the parties do part company, however, is on the factual side of this case, specifically, whether the circumstances present here justify the argument that the redemption of Mrs. Lambert’s shares served a reasonable business need.
To put this issue into proper focus, it is essential to note that, in the cases which have upheld a corporation’s decision to redeem a shareholder’s interest on grounds of reasonable business need, the dispositive factual consideration was *80 always the existence of competing demands among shareholders of a sort that imperiled the very existence of the corporation or, at least, the manner in which up to then it had been successfully conducting its business affairs.
An example is Mountain State Steel Foundries, Inc. v. Commissioner, 284 F. 2d 737 (4th Cir.1960), a case in which it was held that the application of present and future earnings and profits for the redemption of 50 percent of the corporation’s stock served a reasonable business need (rather than as a vehicle for dividend avoidance) in light of the fact that the two families owning all the stock had antagonistic interests which, if left unresolved, would have resulted in the corporation’s liquidation.
The corporation had been owned equally by Ben Miller and Harold Stratton. Upon the death of Ben Miller, his widow and children inherited his stock. The Millers, who took no active part in the conduct of the business, became unhappy with the uncertain prospect of dividend payments, while the Strattons, who were active in the business and already deriving income from it through salaries, were interested in expanding and improving the business. This conflict of interest between the stockholders led Mrs. Miller to demand that the business be sold. An attempt was made to find a purchaser for all of the stock or the corporate assets. This proved unsuccessful. It was then proposed by Mrs. Miller that the corporation buy her stock with payménts to be made over a period of years. This was agreed to. Be-garding the decision to redeem the Miller’s interest, the court stated:
When the stockholders have such conflicting interests, the corporation and its future are necessarily affected. When the situation results in demands that the business be sold or liquidated, as it did here, the impact of the conflict upon the corporation is direct and immediate. * * * The resolution of such a conflict, so that the need of the corporation may govern managerial decision, is plainly a corporate purpose. [Mountain State Steel Foundries, Inc. v. United States, supra, 284 F. 2d at 745.]
The outcome that was reached in Mountain State had its counterpart in the earlier decision of Dill Manufacturing Co. *81 v. Commissioner, 39 B.T.A. 1023 (1939). There, as in Mountain State, dissatisfaction with the dividends generated by the business led the owners of a minority interest in the corporation (a 49.98 percent interest) to demand the sale of the business or else its merger with a larger concern. To overcome this dissension, it was determined that the minority stock interests would be redeemed through what amounted to a partial liquidation carried out over a five-year period. The Commissioner challenged the redemption on the grounds that it represented a diversion of earnings that had been planned from the outset of the corporation. The challenge failed for lack of proof;[6] the court went on to say:
* * * The petitioner [the corporate plaintiff] constituted the life work of its operating officers. They had built it and were proud of it. The protection of the economic and financial independence of that work was scarcely less warranted as a business purpose than if petitioner had been an individual. [39 B.T.A. at 1033.]
The concept of protective redemption presented by the facts in Mowatain State and Bill Manufacturing is repeated in other decisions as well. Among these are: Fred F. Fischer, 6 CCH Tax Ct. Mem. 520 (1947), where the redemption became necessary in order to head off receivership proceedings threatened by a minority shareholder; Farmers & Merchants Investment Co., 29 CCH Tax Ct. Mem. 705 (1970), and Penn Needle Art Co., 17 CCH Tax Ct. Mem. 504 (1958), where redemptions were triggered by an unexpected, but serious rupture in the long-standing relationship between the owner-managers of the businesses involved and the consequent demand that the interests of one or the other be bought out, and, finally, Gazette Publishing Co. v. Self, 103 F. Supp. 779 (E.D. Ark. 1952), where again unexpected discord precipitated the corporation’s need to apply an existing accumulation (earlier earmarked for other business needs) to redeem the shares of an owner-manager (a 21.15 percent interest and the largest single stockholder) in order to prevent that interest from being acquired by outsiders whose endeavor might *82 then be to change the corporation’s editorial and management policies.
Mindful of the import of these several decisions, plaintiffs now make the argument that similar considerations of business necessity dictated the redemption of Mrs. Lambert’s shares. The plaintiffs’ business, it is claimed, demanded active participation in day-to-day affairs on the part of the major owners. In addition, because they were closely ¡held corporations, it is said too that the plaintiffs required a highly active shareholder-management force committed to similar management goals. The argument is that these requirements, when assessed in light of the disparity between the Lamberts with regard to their respective levels of participation in day-to-day corporate affairs and the differences between them concerning business goals and objectives, dictated the need for redemption in order to eliminate claimed immediate and potential future disharmony.
As said, the Government for its part does not question the premise that redemptions undertaken to insure corporate survival or to head-off paralyzing disunity serve a reasonable business need. Lather, what the Government attacks is the factual basis for the taxpayer’s argument — the contention that Mrs. Lambert’s position as owner represented a source of immediate as well as future dissension sufficient to warrant her purchased withdrawal. The Government flatly says that there was never a threat to liquidate taxpayers as a result of shareholder differences nor was there any plausible basis upon which to speculate concerning future discord.
The Government’s challenge on the facts is well taken. The evidence, rather than supporting the argument made, cuts the other way. First, as to the contention that the corporations required an owner-manager force that would devote itself fully to everyday business affairs, the facts show otherwise. During the partnership years, Mrs. Lambert’s participation in daily business matters had been gradually lessening so that by 1959, the year of incorporation, her involvement with the concerns of daily business matters was by then, at best, occasional. Thus, the corporations never had the benefit of her daily involvement, and given, nevertheless, their profitability in the years that followed incorporation, it can hardly be *83 claimed now that business success demanded equal participation on the part of the owners.
As to the second contention, namely, that the corporations needed a shareholder-management force committed to conn mon business goals, here, again, history demonstrates otherwise. Mrs. Lambert’s disenchantment with the business and her unwillingness to remain committed to the expansion-oriented ambitions of her husband were attitudes which had firmly crystallized by 1959. But, 'again, neither of these “anti-business” attitudes impeded the profitability of the business operations in the po'st-1959 period. Indeed, it is significant to note that offers to expand the business through the purchase of other insurance agencies were tendered as late as 1967— the very year in which Mrs. Lambert’s stock redemption was informally agreed upon.
It is true, of course, that after 1959, the operations, though continuing to be profitable, did not continue to grow. However, there is nothing in the record to suggest that stability, rather than continued growth, was the consequence of Mrs. Lambert’s retreat from active participation and wholehearted commitment to the business. During this period, the business functioned as it had always before — final decisions on all important matters rested with Mr. Lambert. And those decisions, while perhaps not always warmly endorsed by Mrs. Lambert, were nevertheless always adopted by her. Her disagreements, such as they were, never rose to the point of obstruction.
On the basis of these facts — the on-going profitability of the business enterprise in the years following incorporation coupled with the essentially passive role played by Mrs. Lambert during this same time frame — it cannot be claimed that her role in the business was such as to warrant its identification with the success and direction of the business either in the past or for the future. Because Mrs. Lambert played only a minimal, nonassertive, role in the business life of the corporations, the redemption of her shares really gained the corporations nothing. In point of fact, after the redemption business was conducted on the same basis as it had been conducted before the redemption. Mr. Lambert continued to consult with Mrs. Lambert (though perhaps not with the *84 same degree of frequency) and, just as before, final decisions rested ultimately with Mr. Lambert. In short, the business purpose ascribed to the redemption was nonexistent; the redemption redounded only to the personal benefit of Mrs. Lambert for it permitted 'her to receive capital gain treatment for distributions that would otherwise have came to her as dividends subject to taxation at ordinary income rates. It follows, therefore, that the accumulations of earnings and profits to satisfy the redemption obligations fulfilled no reasonable business need of the corporate taxpayers.
B. When earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, then Section 533 declares that this shall be determinative of the purpose to avoid the tax “unless the corporation by the preponderance of the evidence shall prove to the contrary.” This section, in addition to creating a statutory presumption of an avoidance purpose also provides a taxpayer with what was described by Justice Harlan in his separate opinion in United States v. Donruss Co., 393 U.S. 297, 310 (1969), as a “last clear chance” to show that, the unreasonableness of the accumulation notwithstanding, it was nevertheless not inspired by tax avoidance considerations. But, to prevail, the taxpayers must establish by the preponderance of the evidence that tax avoidance with respect to shareholders was not one of the purposes for the accumulation beyond the reasonable needs of the business. United States v. Donruss Co., supra. That required showing has not been made here and the presumption therefore controls the outcome.
An extended analysis justifying the decision against the taxpayers is not required. The accumulations of earnings that were brought into issue in this case were sought to be justified on only one business ground, that being, the decision to redeem Mrs. Lambert’s shares. The rejection of that ground as a legitimate business need, together with the absence here of any other comparatively objective criteria that might explain the accumulations from a business-need standpoint, directs the focus for determining intent (meaning, the actual purpose for the accumulations) to considerations personal to the shareholders. And that does not offer enough to win, at least not this case.
*85 The record bares tbe fact that Mr. Lambert was well aware of tbe undesirable effect that a distribution of earnings and profits would have upon tbe Lamberts’ personal income tax.[7] Indeed, one could go so far as to say that awareness of these tax consequences actually contributed to tbe decision to accumulate for it was admitted that tax ramifications were “considered” in setting dividend policy. However, taMng this admission only in its narrowest sense, that is, that there was knowledge of tbe tax consequences without any attendant purpose to avoid taxes, still, this fact, when joined with the lack of any acceptable business reason for the accumulation of earnings and profits, leaves the proof wanting. Simply put, the presumption of Section 533 has not been overcome.
This is not to say that a purpose to avoid the tax with respect to shareholders may be implied in every case where knowledge of the tax consequences of an accumulation has been shown to exist. Clearly, that is not the law. United States v. Donruss Co., supra, 393 U.S. at 309. Rather, the point intended is an evidentiary one: the presumption of a tax avoidance purpose that arises under Section 533 on the basis of a finding of an unreasonable accumulation is a formidable one to overcome; and, when further buttressed by proof of actual knowledge of the favorable tax consequences to the shareholders of such accumulations, it becomes imperative that the proof demonstrate reasonably definite grounds from which to infer the existence of a contrary purpose. Here no business needs were offered as reasons for the accumulations in issue save the intended redemptions and, as to these last, there is nothing to suggest that the redemptions would have taken place even if the accumulations for that purpose had held out no possibility of tax savings to the shareholders. The combination of an accumulation beyond the reasonable needs of the business joined with a corresponding tax advantage to the corporation’s shareholders “is evidence enough to uphold *86 tbe taxes in question.” Trico Products Corp. v. McGowan, 67 F. Supp. 311, 325 (W.D.N.Y.1946).
C. A final matter that needs to be addressed concerns the question of interest. The taxpayers were assessed interest on their accumulated earnings taxes measured from the due date of their respective corporate income tax returns rather than from the date that the Government first gave notice and demand for the taxes. The collection of this “pre-notice” interest was contrary to the decision in Motor Fuel Carriers, Inc. v. United States, 190 Ct. Cl. 385, 420 F. 2d 702 (1970), the case in which this court held that interest with respect to a deficiency assessed on account of the accumulated earnings tax begins to run only after notice and demand by the Government and not from any earlier time.
The Government concedes that there was an erroneous assessment of interest. However, it denies that plaintiffs are entitled to any recovery on account of it. The denial rests on the contention that plaintiffs failed to raise the interest issue in their administrative refund claims; additionally, they failed to raise it in this court either in their petition, their pretrial submissions, or in their opening brief.[8]
The Government’s position must be upheld. “It is an undisputed general rule that a ground for refund neither specifically raised by, nor comprised within the general language of, a timely formal or informal application for refund to the Internal Nevenue Service cannot be considered by a court in which a suit for refund is subsequently initiated.” Union Pacific R.R. v. United States, 182 Ct. Cl. 103, 108, 389 F. 2d 437, 442 (1968). Even where deficiency interest alone is at stake, timely notice at the administrative level is a prerequisite to later suit. Alexander Proudfoot Co. v. United States, 197 Ct. Cl. 219, 454 F. 2d 1379 (1972). Such notice was not given here.
In the administrative refund claims which the taxpayers filed in this case, it was stated that the amount of the accumulated earnings tax that had been paid “together with interest * * * was erroneously assessed and collected.” Given as the reason for the alleged erroneous assessment was that the “[tjaxpayer had definitely committed itself to a proposed *87 purchase of its shares from a shareholder and had earmarked the allegedly accumulated funds for such purpose.”[9] The refunds sought were for the entire amount assessed in each year. Thus, in reality, the taxpayers had limited their claims for refund to the validity of the underlying tax, and interest, to the extent that it was also being contested, was tied entirely to the lawfulness of the principal tax. An independent claim for “pre-notice” interest was clearly not presented. And, on the basis of what was said in the refund claims, it would be inappropriate to infer notice of such a claim now. Moreover, the fact that plaintiffs filed claims for refund sufficient in amount to encompass the lesser amounts that a recovery of pre-notice interest would entail is of no legal consequence for “[n] umbers alone * * * cannot satisfy the rule that a claim for refund must set out the grounds upon which it rests.” Estate of McCabe v. United States, 201 Ct. Cl. 243, 246, 475 F. 2d 1142, 1144 (1973).
On this same subject, and for the sake of fully addressing the matter of notice, there is one last point that merits comment. In the rejection of the plaintiffs’ refund claims, the Internal Revenue Service responded by saying that, “[repayment of interest assessed has been disallowed on the basis of Bardahl Corp. decision made by the U.S. District Court, West District, Washington, #7899 dated 11-10-69.” This stated reason for disallowance — which was addressed to the whole amount claimed — would appear to have had nothing at all to do with the grounds upon which the refunds had been sought. More than that, however, the point we note is that the Bardahl decision that was referred to by the Internal Revenue Service (Bardahl Mfg. Corp. v. United States, P-H 1970 Fed. Tax Serv. (25 Am. Fed. Tax R. 2d 70-429) ¶70-338 (W.D. Wash., Nov. 10, 1969))[10] was exclusively concerned with the same issue which this court dealt with (and decided otherwise) in Motor Fuel Carriers, Inc. v. United States, supra, namely, the starting date for the assessment of interest in connection with an accumulated earnings tax deficiency. Thus, the reference to the Bardahl decision, albeit *88 perhaps an erroneous reference in the sense that it did not relate to the matters raised in the refund claims, might nevertheless lend support to the position that the Internal Eevenue Service had construed the refund claims as including a challenge to the legality of assessing interest from the due date of the corporate returns, hence, had notice of a claim in this regard. Particularly would this be so in view of the fact that the administrative action was apparently taken after this court’s contrary decision in Motor Fuel Carriers had been handed down.
The foregoing point has not, however, been raised by the plaintiffs in this litigation in support of their belated interest argument. In view of this, and in view also of the ambiguities inherent in the administrative action (as noted, the Internal Revenue Service rejected the entirety of the refund claims on the authority of the BardaM decision even though the pre-notice interest dealt with in that case logically comprised only a small portion of plaintiffs’ claims), it would be unwise for the court to now favor plaintiffs by constructing a notice argument in their behalf from facts that neither party has addressed. Plaintiffs are, therefore, not entitled to recover any part of the interest that was paid. Nor are they otherwise entitled to any recovery. The assessments against them were correct.
CONGLUSION OP LAW
Upon the trial judge’s findings and opinion, which are adopted by the court, the court concludes as a matter of law that plaintiffs are not entitled to recover and the petition is dismissed.

 Whereas the court adopts the trial judge’s separate findings of fact, which are set forth in Ms report filed June 9, 1976, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

 Unless otherwise Indicated, all code section references In this opinion are to the Internal Revenue Code of 1954, as amended and In effect In the years In issue.

 The facts recited in this opinion restate the separate Rinding of Fact only to the extent necessary to an understanding of the result.

 Tie 10-yeai cut-off period -was deemed to be significant in this situation because counsel (not the present counsel of record) had previously advised that, after this period, the parties could safely proceed with regard to the issue for which the tax ruling had been sought, namely, the certainty that any gain realized by Mrs. Lambert upon the redemption of her shares would then qualify as long-term capital gain.

 As used here, “current assets” Include the balance sheet items of cash, accounts receivable, other current assets and investments in corporate securities ; excluded are investments in buildings, land and other business-related assets such .as the cash surrender value of insurance policies. “Current liabilities” here include all liabilities except capital stock and retained earnings. The corporations had no long-term debts.

 Section 532(b) exempts personal holding companies, foreign personal holding companies, and certain tax-exempt corporations. Both types of holding companies are taxed under other provisions of the code. See Internal Revenue Code of 1954, § § 541-47 (personal holding companies) ; Internal Revenue Code of 1954, §§ 551-58 (foreign personal holding companies).

 The tax is imposed for each taxable year at ia rate of 27 % percent on the first $100,000 of accumulated taxable income (defined in Section 535) and 38% percent on accumulated taxable income in excess of $100,000. Section 531.

 In Dill Manufacturing Co. v. Commissioner, 39 B.T.A. 1023 (1939), the Commissioner had made no determination of an accumulated earnings tax deficiency until the filing of an amended answer in the Tax Court; hence the burden of proof as to that issue was on the Government.

 In 1967, Rad the Northeastern Agency paid dividends equal in amount to its net alter tax income of $19,167.41 (in lieu of the $250 dividend that was paid), the Lamberts’ own federal tax liability would have been increased by $11,290.33. Similarly, in 1968, had the taxpayers each paid dividends equal to the total of their net after tax income of $28,675.48 (in lieu of the $250 which each did pay), the Lamberts’ own federal tax liability would have been increased by $20,715.96.

 The issue did not surface until it was raised by the Government in its brief.

 There were three refund claims submitted, one for each of the years in issue. Except for differences in the amounts involved, their wording was identical.

 [Subsequently, this decision was reversed, 452 F. 2d 604 (9th Cir.1971).]