PER CURIAM.
 

 This tax refund suit for tax years 1964, 1967, 1969-1971, comes before us on appeal from the United States Claims Court.
 
 *
 
 Two issues are involved: (1) whether taxpayer Ottawa Silica Company is entitled to certain percentage depletion deductions for 1965-71, and (2) whether that company may claim a charitable contribution for the transfer of land to a high school district. On both questions, Judge Colaianni ruled against taxpayer and therefore dismissed its petition. We fully agree with that opinion, which is appended hereto, and therefore affirm on the basis of that opinion.
 

 Affirmed.
 

 APPENDIX
 

 The opinion of Judge Colaianni of the Claims Court follows:
 

 In this action, plaintiff, Ottawa Silica Company, seeks to recover federal income taxes and assessed interest for its tax years 1964, 1967, 1969, 1970 and 1971, plus statutory interest. There are two issues to be resolved: whether Ottawa Silica Company (Ottawa) is entitled to certain percentage depletion deductions for the years 1965-71, and whether it may claim a charitable contribution for the transfer of land to a high school district.
 
 [1]
 

 Ottawa is a family-owned corporation organized and existing under the laws of the State of Delaware and has its principal place of business in Ottawa, Illinois. Ottawa has been engaged in the mining, processing and marketing of industrial sand known as silica since 1900. Silica sand, also known as quartzite, as distinguished from
 
 *1126
 
 common sand, is a highly refined industrial mineral. It is the basic raw material of the glass and ceramic industry. It is also used in the foundry industry as a core and molding sand. Its industrial uses in chemical markets include: paint, testing sand, and hydrofracing sand for the oil well industry.
 

 Although Ottawa, Illinois, remains the company’s major mining location and its corporate headquarters, the high freight costs for shipping silica forced plaintiff to acquire other companies in various geographic locations throughout the country. Thus plaintiff acquired the Michigan Division in Richwood, Michigan, in the late 1940’s. To better serve the east coast market, plaintiff acquired the Connecticut Silica Company in 1959.
 

 Similarly, plaintiff in the mid-1950’s was interested in acquiring mining property on the west coast so it could be as close as possible to its west coast customers. In 1956 plaintiff incorporated the Oceanside Realty and Development Company (ORDC), as a subsidiary under the laws of Delaware, to acquire and own its west coast mining properties. Its certificate of incorporation authorized ORDC to engage in a broad range of business activities, including the acquisition, development, and management of real property. At the same time, Ottawa purchased the stock of Crystal Silica Company (CSC), which operated a mining plant in Oceanside, California. CSC owned 80 acres of what was once silica-rich land in the eastern part of Oceanside on which its plant was located. CSC also held a mineral lease to lands on adjoining property known as the Freeman Ranch. In 1957, ORDC purchased the Freeman Ranch and granted CSC the right to mine the silica deposits. ORDC in turn received royalties from CSC for its mining operations. ORDC acquired the Freeman Ranch primarily to obtain its silica deposits, although only 377 acres of the 725-acre ranch contained mineable reserves. Eastern Oceanside was generally zoned for agricultural use, but the city’s general plan proposed eventual residential uses. CSC’s silica plant and mines have been operating under conditional use permits which allowed industrial activities in the agricultural zone.
 

 The eastern part of Oceanside in which both the CSC operation and the Freeman Ranch are located was, in the late 1950’s, being primarily used as open ranch land and, to a lesser degree, for dry farming. The only developed area was a retirement community, known as Oceana, that lay to the northwest of the Freeman Ranch. The area in question, as shown in the following map, would eventually be serviced, in the main, by three major roads.
 

 
 *1127
 

 Plaintiff's Land Holdings in East Oceanside
 

 To the south of the Freeman Ranch, Oceanside Boulevard ran in an east-west direction. El Camino Real ran along the western end of the Freeman Ranch, in a north-south direction, intersecting Oceanside Boulevard at the southwest corner of the ranch. Somewhat to the north of the Freeman Ranch, El Camino Real intersected Mission Boulevard, which ran generally in a northeasterly direction. ORDC later acquired other properties in Oceanside, all of which were substantially surrounded by these three roads.
 

 In October 1964, Ottawa purchased another parcel of land in Oceanside, known as the Cubbison Ranch. The Cubbison Ranch
 
 *1128
 
 was generally in the shape of a reversed “L” and its western boundary adjoined the eastern edge of the Freeman Ranch. From this common boundary the Cubbison Ranch extended to the east and then turned to the north. Approximately 104 acres of the Cubbison Ranch adjoining the Freeman Ranch contained mineable silica deposits. The remainder of the 1,054 Cubbison Ranch contained no mineable reserves. The cost for acquiring both the Freeman and Cubbison Ranches was approximately $4 million.
 

 Oceanside, which was a sleepy city of 4.000 in 1940, has experienced rapid growth since World War II. During WWII, a U.S. Marine Corps base, Camp Pendleton, was established immediately north of Oceanside to train men for the war effort. Today the camp is home to some 40,000 servicemen and their families. The camp runs across the entire northern boundary of Oceanside. Nestled as it is on the California coast, the Pacific Ocean prevents any westward expansion of the city. The city of Carlsbad lies a little south of Oceanside. Thus the only direction in which the city can expand is to the east. The city, which covers some 40 square miles of area, had grown to about 12.000 by 1950. Its population doubled during the next decade, and by November 1980, the population had passed the 70,000 mark.
 

 This phenomenal population growth forced the city to expand geographically in the only direction it could, eastward, and generally towards plaintiffs mining operations. It was because of the apparent collision course between its mining operations and the population growth of Oceanside that the Cubbison Ranch took on even more significance to plaintiff. Specifically, even though over 900 acres of the 1,054-acre Cubbison Ranch were silica poor, they served the useful purpose of slowing down growth and development in the vicinity of CSC’s mining operations.
 

 In the early 1960’s Oceanside was experiencing a very active development boom. The upturn in building was not confined to residential development, for a new junior college was established just south of the Cubbison Ranch. Plaintiff was concerned that the growth in building and development would bring larger concentrations of population nearer to its mining operations. Silica mining is done in a large open pit area and is a notoriously dirty operation. The production process, which is carried out in a plant, in addition to being noisy, is extremely dirty. This sort of mining activity is incompatible with residential use of adjoining land. For this reason, increases in population in the vicinity of a mine have usually led to the shutdown of the mine. The Cubbison Ranch acted as a buffer to isolate CSC’s mining operations from neighboring land uses, especially residential development, with which it was incompatible. Plaintiff hoped, through the use of large buffer areas, to control the pace of development of much of the land surrounding its mining properties.
 

 Following the purchase of the Cubbison property, ORDC was faced with high tax bills, sizable loan carrying costs, and a concern over the future use and disposition of its rather significant land holdings. These concerns in April 1965 led to the retention of William L. Pereira & Associates (Pereira), a land planner, to advise the plaintiff on possible uses for the substantia] nonmineral-bearing portions of its Oceanside property. Mr. John Steiger, a realtor, former member of the city council and vice mayor of Oceanside, had referred plaintiff to Pereira. Mr. Steiger was a long-time friend of Edmund B. Thornton, who during the period relevant to these proceedings, was president of plaintiff. ORDC informed Pereira that CSC’s primary business was silica mining and that the mineral-bearing property should be considered exclusively for mining. Plaintiff, however, allowed Pereira to use its own judgment in planning for the remainder of the property.
 

 On the recommendation of Pereira, ORDC purchased two additional parcels of land, the Talone and Jones Ranches, which abutted its property to the north of the Cubbison and Freeman Ranches, respectively. ORDC purchased the 366-acre Talone Ranch in January 1966 for about $1,200,000 and the 118-acre Jones Ranch in June 1966
 
 *1129
 
 for $400,000. Plaintiff planned no mining on either of these ranches at any time. The four ranches, which cost plaintiff some $5,600,000, totalled about 2,300 acres and together formed a “U” shape, with the Jones Ranch being at the top left (western) side of the “U”, the Freeman Ranch being to the south, the Cubbison Ranch to the east of Freeman, and the Talone Ranch to the north of Cubbison at the top right (eastern) side of the “U”. The 750 acres in the center of the “U” belonged to a Mr. Ivey, who had over the years declined all of plaintiff’s offers to purchase or jointly develop the land, and was content to continue his ranching operation.
 

 During the time that the Pereira report was being formulated, Edmund Thornton, president of Ottawa, met with the Pereira staff on several occasions to review their work and to comment on their recommendations. The Pereira staff also met with officials of the city of Oceanside to coordinate the Pereira Plan with the city’s master street plan. It was intended that the Pereira Plan would be submitted to the city for adoption as part of the city’s master street plan. Thus the road system was planned to integrate with the plans of the city, county and state agencies. Indeed the periphery of ORDC’s land holdings was very carefully dovetailed with the proposed plans so that the Pereira Plan could become a meaningful part of the overall city mosaic. The city planners ultimately did adopt most of the Pereira Plan as its own for the area it covered.
 

 In December 1967, Pereira completed its study and presented to Ottawa a detailed plan calling for the residential and commercial development of the ORDC property in Oceanside, as well as neighboring property owned by others. The report envisioned two stages of development for the area: an “Interim Development Plan” for the short term, and a “Horizon Development Plan,” according to which the whole area would be developed as the population grew. During the interim period, the land would retain its rural character. The land would be used primarily for agricultural purposes and be divided into individual residential lots of relatively large acreage. Once the market for housing made residential development economically feasible, the land would be developed, for its ultimate use, into an urban residential area. This long-term transition from rural to urban land use was intended to allow uninterrupted concurrent mining of silica by ORDC on its mineral rich acreage. The mineral deposits on the Freeman and Cubbison Ranches were expected to last for another 40-50 years and thus full implementation of the Horizon Development Plan was some years in the future. The plan sought by plaintiff, and as produced by Pereira, allowed plaintiff to complete an orderly extraction of silica free of any concern that residential development would force it to stop its mining operations before it wanted to.
 

 An important feature of the Pereira Plan was the “Loop Parkway,” a 6-mile long “scenic collector” road that would traverse and unify the entire development. As planned, the Loop Parkway would extend almost entirely through the ORDC property, following the “U-shaped” configuration of the Jones, Freeman, Cubbison, and Talone Ranches. To the north, at the tops of the “U”, the Loop Parkway was intended to connect with the proposed San Luis Rey Freeway, which was to run in a northeasterly direction somewhat parallel to Mission Boulevard. ORDC had acquired the Jones and Talone Ranches, at Pereira’s urging, in part to assure access to the proposed, but to this date never constructed, San Luis Rey Freeway, and also in the hope of being able to guide and control the development of the area pursuant to its overall plan.
 
 [2]
 

 ORDC adopted the Pereira Plan and used it as a guide in developing its property.
 
 *1130
 
 The plan cost ORDC $82,983.90 and was the largest such report prepared in Oceanside between 1956 and 1977. In 1967, in keeping with Pereira’s Interim Development Plan, ORDC began planting citrus crops on a portion of the Cubbison Ranch. Incremental plantings of lemons, limes, tángelos, oranges, and avacados on some 400 to 600 acres of the ranch were made. The staged plantings were completed in 1974. At the time of trial plaintiff was conducting a commercial citrus operation to help defray the acquisition and carrying costs of the property.
 

 By the mid-1960’s it became apparent that a new high school would be needed to accommodate the ever increasing high school population of Oceanside. In 1964, the Oceanside-Carlsbad Union High School District (OCUHSD), a political subdivision of the State of California, included two high schools, the Oceanside High School and the Carlsbad High School. At that time, Carlsbad High School was approaching its ultimate capacity and Oceanside was straining under a student enrollment which greatly exceeded the facilities of the school. To remedy the overcrowding, the trustees of the district had for years sought voter approval for bonding authority to build a new high school. After several unsuccessful attempts, the voters in the spring of 1968 approved the bond referendum. Although site selection was an ongoing process and the trustees were always on the lookout for a suitable site for the new high school, no site had been selected at the time of the bond referendum. Because the city was expanding eastward, however, a site near El Camino Real, a major north-south road in Oceanside was the most logical location for a new school. The trustees began their search by looking for a site that was situated on improved roads with existing sewer and water lines. Mr. Ivey was approached to donate a site, but he declined. As many as nine sites were evaluated, but for various reasons six were quickly eliminated. Of the three sites remaining, the one most preferred by the trustees was a site at the northeast corner of the Freeman Ranch. The high school district was authorized to spend up to $180,000 for a site, but additional funds were also available for off-site improvements, such as access roads, sewer, water, gas, etc.
 

 Mr. Thomas Jones, is a business consultant, who has represented Ottawa on the west coast and has advised it on real estate matters for many years. During the summer of 1968, John Steiger, the vice mayor of Oceanside, and Alfred LaFleur, the superintendent of the OCUHSD, proposed to Mr. Jones that ORDC or Ottawa consider making a site on the Freeman Ranch available for the new high school. Ottawa later authorized Mr. Jones to represent it in future discussions with the OCUHSD. On September 20, 1968, Mr. LaFleur wrote to Mr. Thornton, Ottawa’s president, to inquire whether ORDC would be interested in donating approximately 50 acres of its land for a school site. On the same day Mr. Jones also wrote to Mr. Thornton to advise him of the discussions he had participated in regarding a high school site. In his letter, Mr. Jones stated that he had met with John Steiger and Larry Bagley, the planning director for Oceanside, and had learned that the school district’s first choice for a high school was on land owned by ORDC. Mr. Jones further stated that the construction of a school on plaintiff’s Oceanside property would hasten development of the eastern portions of the Jones and Freeman Ranches at no cost to ORDC and would result in substantially increased property values. Mr. Jones’ letter assumed that the school district would provide access roads to the school through the ORDC property.
 

 After this exchange of letters in September, representatives from the school district, the city of Oceanside, and Ottawa began discussing the transfer of land to the school district. On December 19, 1968, Thomas Jones attended a special meeting of the board of directors of Ottawa to report on the progress of the discussions. Mr. Jones indicated to the board that details concerning an access road with water and sewer lines would have to be worked out. Following negotiations which extended over al
 
 *1131
 
 most two years, plaintiff, on May 8, 1970, donated a 49.37-acre site for the high school and another almost 20 acres of right-of-way for two access roads to the school. The access roads consisted of Rancho Del Oro, which ran in a generally north-south direction and provided access to Mission Boulevard, and Mesa Drive, which ran in a generally northeasterly direction and connected Rancho Del Oro to El Camino Real.
 

 On its 1970 consolidated federal income tax return, plaintiff claimed a charitable deduction of $319,523 for the value of the 49 acres transferred by ORDC to the school district. This deduction gave plaintiff a charitable contribution carryover from 1970 to 1971. On its 1971 federal tax return, plaintiff redetermined the fair market value of the high school site on the basis of a subsequent sale of an adjacent parcel to some land developers. Plaintiff claimed that the value of the land at the time of the initial sale had been actually $415,223 and therefore increased its carryover by $95,700. The Internal Revenue Service disallowed the deduction on the ground that it was not a charitable contribution within the meaning of 26 U.S.C. § 170 (1976).
 

 Argument
 

 Plaintiff contends that its transfer of the high school site to OCUHSD entitled it to a charitable deduction of $415,223, as permitted by 26 U.S.C. § 170 (1976).
 
 [3]
 
 Section 170 allows as a deduction any charitable contribution made by the taxpayer during the taxable year. A charitable contribution is defined as “a contribution or gift to or for the use of * * * [a] State,
 
 * * * or
 
 any political subdivision [thereof] * * * but only if the contribution or gift is made for exclusively public purposes.” The parties agree that OCUHSD, the recipient of the land, is a political subdivision of the State of' California. Accordingly, to be decided is whether the conveyance of certain of plaintiff’s land to OCUHSD entitled plaintiff to a charitable deduction per § 170 and, if so, in what amount.
 

 The case law dealing with this aspect of a § 170 deduction makes clear that a contribution made to a charity is not made for exclusively public purposes if the donor receives, or anticipates receiving a substantial benefit in return.
 
 Dowell v. United States,
 
 553 F.2d 1233, 1238 (10th Cir.1977);
 
 Sedam v. United States,
 
 518 F.2d 242, 245 (7th Cir.1975);
 
 Collman v. Commissioner,
 
 511 F.2d 1263, 1267 (9th Cir.1975);
 
 Singer Co.
 
 v.
 
 United States,
 
 196 Ct.Cl. 90, 106, 449 F.2d 413 (1972);
 
 Stubbs v. United States,
 
 428 F.2d 885, 887 (9th Cir.1970);
 
 Rusoff v. Commissioner,
 
 65 T.C. 459, 469 (1975).
 
 *
 

 In
 
 Singer,
 
 this court considered whether discount sales of sewing machines to schools and other charities entitled Singer to a charitable deduction. The court found that Singer, which at the time of the sales was in the business of selling sewing machines, had made the discount sales to the schools for the predominant purpose of encouraging the students to use and, in the future, to purchase its sewing machines, thereby increasing Singer’s future sales. This purpose colored the discount sales, making them business transactions rather than charitable contributions. Accordingly, the court disallowed the deduction for the sales to the schools. The court allowed deductions for the discount sales made to other charities, however, because Singer had no expectation of increasing its sales by making the contributions and benefited only incidentally from them.
 

 The
 
 Singer
 
 court noted that the receipt of benefits by the donor need not always preclude a charitable contribution. The court stated its reasoning as follows, at 106, 449 F.2d 413:
 

 [I]f the benefits received, or expected to be received, [by the donor] are substantial, and meaning by that, benefits greater than those that inure to the general public from transfers for charitable pur
 
 *1132
 
 poses (which benefits are merely
 
 incidental
 
 to the transfer), then in such case we feel that the transferor has received, or expects to receive, a
 
 quid pro quo
 
 sufficient to remove the transfer from the realm of deductibility under section 170.
 

 Singer Co. v. United States,
 
 196 Ct.Cl. at 106, 449 F.2d 423. The parties to the present case disagree as to the meaning of the above quotation. The plain language clearly indicates that a “substantial benefit” received in return for a contribution constitutes a
 
 quid pro quo,
 
 which precludes a deduction. The court defined a substantial benefit as one that is “greater than those that inure to the general public from transfers for charitable purposes.”
 
 Id.
 
 at 106, 449 F.2d at 423. Those benefits that inure to the general public from charitable contributions are incidental to the contribution, and the donor, as a member of the general public, may receive them. It is only when the donor receives or expects to receive additional substantial benefits that courts are likely to conclude that a
 
 quid pro quo
 
 for the transfer exists and that the donor is therefore not entitled to a charitable deduction.
 
 Id.
 
 at 107, 449 F.2d at 423.
 
 **
 

 The issue to be resolved is thus whether, in light of
 
 Singer,
 
 plaintiff is entitled to a § 170 deduction for its transfer of land to the school district. In
 
 Singer,
 
 the court concluded that the expected receipt of increased profits by Singer, either immediately or in the future, was incompatible with its claim for a charitable contribution. Plaintiff argues that it received no benefits, except incidental ones as defined by
 
 Singer,
 
 in return for its contribution of the site, and it is therefore entitled to a § 170 deduction for the transfer of its land to the school district. After having considered the testimony and the evidence adduced at trial, I conclude that the benefits to be derived by plaintiff from the transfer were substantial enough to provide plaintiff with a
 
 quid pro quo
 
 for the transfer and thus effectively destroyed the charitable nature of the transfer.
 

 To begin, although plaintiff is correct in arguing that it was not the moving party in this conveyance, and that the school district sought plaintiff out for a donation of a high school site, that alone fails to justify a § 170 deduction. The record clearly establishes that following the passage of a bonding referendum, which authorized the building of a new high school by the city of Oceanside in 1968, as many as nine sites had been evaluated. Because of the eastward growth of the city, Mr. LaFleur, the superintendent of the OCUHSD, felt that the ideal location for the new high school would be near El Camino Real. Following careful consideration, the city and school district decided that the best location for a high school would be on plaintiff’s land. Thus, during the summer of 1968, John Steiger, the vice-mayor of Oceanside, and Mr. LaFleur approached Mr. Thomas Jones to see if plaintiff would consider making a site on the Freeman Ranch available for the new high school.
 

 On September 20, 1968, Mr. LaFleur wrote to plaintiff’s president, Mr. Thornton, to ask if plaintiff would be willing to donate 50 acres of its land for a school site. The record also establishes, however, that plaintiff was more than willing to oblige Mr. LaFleur on the basis of its own self-interest. Indeed, the evidence shows that on that same September 20, Mr. Jones also wrote to Mr. Thornton to advise him of the discussions he had participated in regarding a high school site. In his letter Mr. Jones stated that he had met with John Steiger and Larry Bagley, Oceanside’s planning director, and had learned that the school district’s first choice for a high school site was on land owned by plaintiff. In a most revealing statement, Mr. Jones went on to say:
 

 I was pessimistic when talking to John and Larry, but this actually could trigger and hasten the development of the whole eastern end of [the] Freeman and Jones
 
 *1133
 
 [ranches] at no cost to us. The increase in these property values should be substantial if this should
 
 go
 
 through. ******
 

 In any event, nothing more is to be done on this until the school board writes to you and asks to open negotiations. On the other hand, I recommend that OR & DC actively pursue this, since a high school in this location would probably trigger the early development of El Camino Real from the May Co. to Mission Road.
 

 The exact meaning of Mr. Jones’ statement will be better understood following a full development of the prevailing circumstances at the time of the transfer. It should be recalled that plaintiff had amassed some 2,300 acres in eastern Oceanside, but only 481 acres had silica reserves. Thus, almost 1,800 acres were of no direct use to plaintiff’s mining business. Plaintiff’s concern about what to do with these vast holdings caused it to turn to William L. Pereira & Associates for help. Plaintiff’s holdings in April 1965, when it first engaged Pereira, were somewhat smaller and consisted of the Freeman and Cubbison Ranches and totaled approximately 1,900 acres. The property ran for a substantial distance from El Camino Real along Oceanside Boulevard. At the eastern end of its holding, the northern expanse of the Cubbison Ranch stopped considerably short of Mission Boulevard. While a portion of the western boundary of the Freeman Ranch ran along El Camino Real, its northernmost boundary was about a mile from all of the major roads. The unavailability of major roads to service the northernmost reaches of the Cubbison and Freeman Ranches ultimately led Pereira to recommend that plaintiff purchase the Jones and Talone Ranches. The report states, at 22:
 

 Holdings by OR & DC were expanded during this study by acquisition of the 345-acre Talone property, which provided a connecting link northeast to Mission Boulevard and the future San Luis Rey Freeway; and by acquisition of 120 acres of the Jones property which assures connection to the Mission on the northwest.
 

 Implementation of the Pereira Plan began in May 1967 with the grading of a 2-mile length of the main “Loop Parkway” south and west from Mission Boulevard. This opened the first gateway into the Talone property, and the completed Pereira report stated that the opening of the gateway was “aimed at marketing * * * the first ‘pilot’ small farms early in 1968.” The report goes on to provide, at 58:
 

 The first increment of construction, represented by the pilot project, encompasses approximately 600 acres in the eastern portion of the property. This area is traversed by both the parkway loop and College Boulevard extension and contains many of the prime residential view sites in the area. It will be reached by traveling approximately one mile from Mission Boulevard through the Talone portion, which is saved for future development.
 

 Oceanside Realty & Development Company is in the process of planting 5 ten-acre small farms with oranges, lemons and tángelos as a demonstration for future buyers. * * *
 

 ******
 

 The pilot small farms project, which has already begun, can ultimately involve about 600 acres in the development of small farms. * * *
 

 The plan points out that an industrial park, which was to be built on the central part of the old Cubbison Ranch that was proximate to Oceanside Boulevard, would be developed next.
 

 Returning to a discussion of that area of plaintiff’s holdings that more directly concerns the location of the school site and the access roads, the Pereira report pointed out that the northern portion of the Freeman property consisted of gentle slopes of an inner valley and was particularly suitable for agricultural and recreational uses. The report, however, noted that this area was “fairly remote from existing services [roads, sewers, and water lines].”
 

 
 *1134
 
 That part of the Freeman Ranch through which Mesa Drive was to be built was described as the—
 

 Inner Valley gateway; [which] provides [a] link to El Camino Real; fairly flat land, suitable for predominantly higher density residential use; near existing services [at 57].
 

 Finally, the Jones Ranch, through which Rancho Del Oro was to be built, was described as having a—
 

 [D]ramatic hilltop giving [a] sweeping outlook over Mission and San Luis Rey Valley; in future will have superb access to freeway; * * * [but presently is] remote from existing services [at 57].
 

 The report, of course, referred to the proposed San Luis Rey Freeway, construction of which, as has previously been pointed out, was scheduled to begin in 1973, and was to run along the northern boundary of the Jones property.
 

 Pereira had proposed a Market Village for the Jones Ranch in order to dramatize—
 

 [T]he main gateway to the western portion of the property from the 18th Centry mission [San Luis Rey] in the valley below [at 47].
 

 * * * * * #
 

 In its ultimate development, the “Market Village” is envisioned as a complex of many elements — shops, stalls, restaurants, small offices, studios, apartments, a theater or two — which will be literally “an architectural hill” [at 47].
 

 The only thing frustrating the implementation of the plan was the inaccessibility of the Jones Ranch from Mission Boulevard. The following statement from the Pereira report shows that plaintiff was aware that the inaccessibility of the Jones Ranch to Mission Boulevard could delay implementation of the plan (at 35):
 

 The only element of the plan which depends, to a certain extent, on agreements or decisions outside the OR & DC property lines is the development of the market village. This is because a real gateway cannot be opened to Mission Boulevard until ments permit the Parkway to traverse 750 feet of Ivey property and 600 feet of Mission property. As the City [Oceanside] has indicated that this alignment will be a recommended amendment to the master plan of streets, eventual agreement seems assured; but if the other property owners resist the street, the City would have to exercise right of eminent domain in acquiring right of way.
 

 Moreover, any hope which the plaintiff may have had that its problem would be solved by the San Luis Rey Freeway would have been disappointed since to date that freeway has not been built. Thus, the hopes of plaintiff for implementing the Pereira Plan were clearly dependent upon a road being built through the Jones Ranch and across the Ivey and Mission properties. Only with the above background facts in mind can the full meaning of Mr. Jones’ statement to Mr. Thornton be appreciated. There can be no doubt that the absence of an access road through the Jones Ranch to Mission Boulevard would impede the development of the Jones and Freeman Ranches for many years.
 

 The construction of a high school on the Freeman Ranch, however, alleviated this problem for plaintiff. State and local officials required that the high school be serviced by two separate access roads. After some discussions, the school district and plaintiff agreed on the general direction of Mesa Drive which would provide the school with access to El Camino Real, and the surrounding topography dictated that the second road run north to Mission Boulevard through the Jones Ranch and parcels of property owned by Mr. Ivey and the Mission of San Luis Rey. This road, Rancho Del Oro Drive, provided plaintiff with access to the Jones Ranch directly from Mission Boulevard. Plaintiff could not have obtained such access to Mission Boulevard on its own unless both Mr. Ivey and the fathers at the mission had agreed to convey part of their land or easements to plaintiff. There is no evidence suggesting that either party was interested in doing so. Mr. Ivey, in fact, had resisted plaintiff’s overtures about selling or developing his land.
 

 
 *1135
 
 Thus, the importance of the two access roads to the development of plaintiff’s western holdings cannot be gain-said. The plans for which plaintiff had paid Pereira some $83,000 to prepare could not be fulfilled because of its inability to run a road through the Freeman and Jones Ranches to Mission Boulevard. The northern boundary of the Jones Ranch was separated by almost 1,400 feet, by property that belonged to the Ivey Ranch and the Mission of San Luis Rey, from Mission Boulevard. Although plaintiff may have hoped that the city would exercise its eminent domain power to permit a road to be built over the Ivey and Mission properties, there was no assurance that this would occur. Also, as Mr. Thornton testified, plaintiff looked to the construction of the San Luis Rey Freeway, which was projected to run along the northern boundary of the Jones Ranch, to provide the access it needed. However, that freeway has never been built.
 

 When the school district and the city thus came to plaintiff and asked for a school site and access roads, it is not surprising that plaintiff would be willing to go along because it could see — as Mr. Jones stated— that such action “could trigger and hasten the development of the whole eastern end of Freeman and Jones at no cost to * * * [plaintiff].” Mr. Jones’ recommendation to plaintiff accordingly was that plaintiff
 
 “actively pursue
 
 ” the negotiations.
 

 Further insight regarding the benefits which plaintiff’s representative felt would inure to plaintiff is evident from an April 30, 1969, letter from plaintiff’s west coast counsel to plaintiff’s Chicago counsel. In that letter counsel discussed the importance that the access roads (Mesa Drive and Rancho Del Oro) be open for public use as soon as possible and pointed out that Mr. Jones at an April 22, 1969, meeting with representatives from the school district and officials of the city emphasized the importance of this. The letter goes on to state:
 

 He [Mr. Thomas Jones] pointed out that one of the important considerations to the owner of the land [plaintiff] in granting the easements and the school site would be the benefits to accrue to the surrounding properties as a result of the availability of such a road for public purposes. He [Mr. Jones] strongly suggested that all of the interested parties continue to give some thought to the matter with ' the hopes of coming up with a plan whereby the streets could be dedicated to public use immediately.
 

 It is thus quite apparent that plaintiff conveyed the land to the school district fully expecting that as a consequence of the construction of public access roads through its property it would receive substantial benefits in return. In fact, this is precisely what happened. Plaintiff obtained direct access to the Jones Ranch via Rancho Del Oro Drive and ultimately sold the ranch to a developer. Plaintiff also sold two parcels of the Freeman Ranch, lying north of Mesa Drive, to other developers. The
 
 Singer
 
 opinion is quite explicit in providing that the receipt or expected receipt of substantial benefits in return for a conveyance precludes a charitable contribution under § 170. It is my opinion that the plaintiff knew that the construction of a school and the attendant roads on its property would substantially benefit the surrounding land, that it made the conveyance expecting its remaining property to increase in value, and that the expected receipt of these benefits at least partially prompted plaintiff to make the conveyance. Under
 
 Singer,
 
 this is more than adequate reason to deny plaintiff a charitable contribution for its conveyance.
 

 The second issue raised by plaintiff concerns the degree to which the court will allow a taxpayer to vary the grounds of its suit from those raised in the claims for refund. Plaintiff has alleged that the IRS failed to allow it the full percentage depletion deduction that it was entitled to and, in so doing also failed to allow plaintiff the full consolidated net operating loss deduction it was entitled to for 1967. The parties have reached an agreement that is dispositive of the substantive aspects of both the percentage depletion and the net operating loss issues. The procedural issue which remains to be resolved is whether the grounds
 
 *1136
 
 for relief stated in plaintiff’s claim for a refund are adequate to confer jurisdiction on this court over an aspect of the percentage depletion deduction not mentioned in the refund claim. It is my opinion that the jurisdiction of this court does not extend to those aspects of the percentage depletion deduction and the 1967 net operating loss that were not adequately raised on plaintiff’s claims for refund.
 

 During all times relevant to these proceedings, Ottawa and its subsidiaries sold a form of industrial sand, or quartzite, known as silica, which is a mineral described in section 613(b)(7) of the Internal Revenue Code. The code allows plaintiff a percentage depletion deduction for the silica it removes from each of its mining properties. The allowable deduction is the lesser of: (a) the gross income from the property multiplied by the appropriate percentage depletion rate specified in section 613(b)(7), or (b) 50 percent of the taxable income from the property. 26 U.S.C. § 613(a) (1976). The term “gross income from the property” means the gross income from mining, which is that amount of income “attributable to the processes of extraction of the ores or minerals from the ground and the application of mining processes.” Treas.Reg. § 1.613-4(a). Packaging the ore or minerals is a non-mining process.
 
 Id.
 

 On its federal income tax returns for the tax years 1964 through 1971, plaintiff took percentage depletion deductions for the silica it had mined from its properties. During this time plaintiff sold the silica both in bags and in bulk quantities. In computing the gross income from mining for each type of the silica products, plaintiff’s accountants used a bulk sales price. They considered any extra income derived from the sale of bagged products as income attributable to a non-mining process. For that reason, they excluded the extra income from their calculations when determining the gross income from mining figure for the bagged products.
 

 One of the items plaintiff sold was a bagged product known as Ottawa Testing Sand. Plaintiff sold the testing sand only in bags and for a price substantially higher than the bulk price of its other products. Plaintiff’s accountants, however, computed the gross income from mining figure for the testing sand by using the bulk sales price. The accountants could have calculated the gross income by using the actual sales price of the testing sand less the costs attributable to the non-mining processes (bagging). Had they done so, the gross income from mining for the testing sand would have been greater than the figure obtained using the bulk price. Thus, the use of the bulk price produced a lower gross income from mining, which in turn yielded a lower percentage depletion deduction for the testing sand when multiplied by the applicable rate. Plaintiff first learned that it had understated the gross income from mining and the depletion deduction for the testing sand in July 1977, during an IRS audit of plaintiff’s tax returns for 1972 through 1975.
 

 On its tax returns for the years 1964 through 1972, plaintiff had used rates of 15 percent or 14 percent in calculating its percentage depletion deduction. After examining plaintiff’s returns, the IRS reduced the depletion deduction by requiring plaintiff to use a 5 percent rate for some of its products. The reports prepared by the examining agents for the fiscal years ending on January 1,1967, December 31,1967, and December 29, 1968, gave the following reasons for reducing the percentage depletion deductions:
 

 A 15% rate of percentage depletion was claimed on all of the income from the sale of the silica sand and quartzite sold after the application of the ordinary mine treatment processes. A 5% rate of percentage depletion is recommended on the silica sand and quartzite sold for use as strecco stone, plaster, exposed aggregate, golf trap sand and like uses.
 

 In a report dated May 31, 1973, the IRS made similar reductions of the depletion deduction for the fiscal years ending on December 28, 1969, January 3, 1971, and January 2, 1972. That report provided:
 

 Taxpayer has computed depletion based on 15% in the first year and on 14%
 
 *1137
 
 in the succeeding two years. Most of the products sold go into use in the glass or foundry industries. Some of the products are sold to construction industries and some small amounts are sold for such uses as golf trap sand or as playsand, which qualify only for a 5% depletion rate.
 

 The IRS made no other adjustments to the percentage depletion deductions aside from the reduction of the depletion rate for some of plaintiff’s products. Accordingly, the IRS reduced plaintiff’s depletion deductions by the following amounts for each of the following fiscal years:
 

 FYE 1/2/66 $ 5,701.00
 

 1/1/67 16,977.00
 

 12/31/67 138,457.15
 

 12/29/68 24.802.64
 

 12/28/69 25.180.64
 

 1/3/71 19,046.37
 

 1/2/72 20,144.67
 

 Plaintiff subsequently paid the resulting tax deficiencies and filed timely refund claims on or about January 7, 1975, for the tax years 1967, 1969, 1970, and 1971. To each of these refund claims plaintiff attached a statement that provided:
 

 This Statement is being attached to Refund Claims of Ottawa Silica Company and Subsidiary Companies for FYE 12/31/67, FYE 12/28/69, FYE 1/3/71 and FYE 1/2/72. The bases for these Refund Claims are as follows:
 

 1. Pursuant to Revenue Agents Reports dated February 4, 1972, as supplemented by a Conference Report dated August 1, 1972, covering FYE 12/31/62, FYE 12/31/63, FYE 12/31/64, FYE 1/2/66, FYE 1/1/67, FYE 12/31/67 and FYE 12/29/68 and a Revenue Agents Report dated August 27, 1931 (presumably meaning 1973) covering FYE 12/28/69, FYE 1/3/71 and 1/2/72 Ottawa Silica Company and/or certain of its consolidated subsidiaries were erroneously denied deductions for the following items:
 

 (a) * * *
 

 (b) Percentage depletion as follows:
 

 FYE
 

 1/2/66 $ 5,701.00
 

 1/1/67 16,977.00
 

 12/31/67 138,457.15
 

 12/29/68 24,802.64
 

 12/28/69 32,333.20
 

 1/3/71 14,214.37
 

 1/2/72 12,339.67
 

 (c) * *
 

 (d) The consolidated net operating loss carryback properly deductible in FYE 12/31/67.
 

 At this time plaintiff did not know that it had erred in calculating the depletion deduction for the Ottawa Testing Sand. It was only in July 1977 that plaintiff discovered that it could have taken a greater deduction for the testing sand, but by then the statute of limitations prevented the filing or amending of its refund claims for the tax years 1964 through 1971.
 

 In June 1978 plaintiff petitioned this court for a refund of its income taxes, alleging
 
 inter alia,
 
 that the IRS had failed to allow it the full depletion deduction it was entitled to. Plaintiff now asks this court to grant it the following deductions for depletion:
 

 Year Additional Deduction Allowable
 

 1965 $ 35,000
 

 1966 50.000
 

 1967 174,000
 

 1968 49.000
 

 1969 49.000
 

 1970 48.000
 

 1971 49.000
 

 The conditions under which a taxpayer may sue the United States for the recovery of income taxes are defined by statute and by regulation. The Internal Revenue Code prohibits any taxpayer from maintaining an action to recover taxes from the Government unless a claim for a refund has first been filed with the Internal Revenue Service (IRS). 26 U.S.C. § 7422(a) (1976).
 
 [4]
 
 The regulations further provide
 
 *1138
 
 that the claim for a refund “must set forth in detail each ground upon which a credit or a refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof.” Treas.Reg. § 301.6402-2(b)(l) (1955). Together, the statute and the regulation preclude a taxpayer-plaintiff from substantially varying at trial the factual bases of its arguments from those raised in the refund claims it presented to the IRS.
 
 Union Carbide Corp. v. United States,
 
 222 Ct.Cl. 75, 90, 612 F.2d 558, 566 (1979);
 
 Cook v. United States,
 
 220 Ct.Cl. 76, 86-87, 599 F.2d 400, 406 (1979).
 

 This court has on many occasions considered the issue of variance and has adhered to the general rule that a ground for a refund that is neither specifically raised by a timely claim for a refund, nor comprised within the general language of the claim, cannot be considered by a court in a subsequent suit for a refund.
 
 Union Pacific Railroad v. United States,
 
 182 Ct.Cl. 103, 108, 389 F.2d 437, 442 (1968);
 
 see Forward Communications Corp. v. United States,
 
 221 Ct.Cl. 582, 623, 608 F.2d 485, 508 (1979);
 
 John B. Lambert & Associates v. United States,
 
 212 Ct.Cl. 71, 86-87 (1976);
 
 Fruehauf Corp.
 
 v.
 
 United States,
 
 201 Ct.Cl. 366, 378-79, 477 F.2d 568, 575 (1973). The reasons for this rule preventing substantial variance are:
 

 [T]o prevent surprise and to give adequate notice to the [Internal Revenue] Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination. * * * In addition, the Commissioner is provided ( with an opportunity to correct any errors, and if disagreement remains, to limit the scope of any ensuing litigation to those issues which have been examined and which he is willing to defend.
 

 Union Pacific Railroad v. United States,
 
 182 Ct.Cl. at 109, 389 F.2d at 442.
 

 In the present case, plaintiff’s refund claims contained no reference to the error it had made in computing the gross income from mining for the testing sand or to the effect of the error on the deductions for depletion and net operating loss.
 
 [5]
 
 This issue arose for the first time in the proceedings before this court. The defendant now argues that the court lacks jurisdiction over the testing sand aspect of plaintiff’s depletion deduction because that issue is at substantial variance with the issues raised in the refund claims. Plaintiff contends, however, that our jurisdiction, having been properly invoked to consider the appropriate rate for part of the depletion deduction, extends as well to determining the appropriate depletion deduction for the testing sand. As part of this argument, plaintiff asserts that the timely refund claim for the rate issue established its right to sue for a refund on the whole depletion issue and that the testing sand error affects only the amount plaintiff is entitled to recover. This court cannot accept plaintiff’s argument.
 

 The statute and the regulations are quite clear. A taxpayer must specify the grounds and the factual bases from which they arise in its claim for a refund if it later wishes to litigate on those grounds. Plaintiff concedes that it failed to mention the testing sand error in its refund claims, but nonetheless relies on the above-stated argument to bring the testing sand error before this court.
 

 Simply put, plaintiff’s argument is without merit — the jurisdiction of this court to hear the dispute over the appropriate depletion rate to be used for some of plaintiff’s products does not extend to the effect of the testing sand error on the depletion
 
 *1139
 
 deduction and net operating loss. The errors plaintiff made in computing the depletion deduction for the Ottawa Testing Sand constitute a separate ground for relief, distinct from the issue of the appropriate rate asserted in the claims for refund. Each issue has a different factual basis and neither is a subsidiary of or integral to the other.
 
 [6]
 
 That being the case, the rule of substantial variance precludes this court from exercising jurisdiction over the issues arising from the testing sand error because they were not first raised in the claim for a refund.
 
 See L.E. Meyers Co. v. United States,
 
 673 F.2d 1366 (Ct.Cl., 1982);
 
 Forward Communications Corp.
 
 v.
 
 United States,
 
 221 Ct.Cl. at 623, 608 F.2d at 508;
 
 John B. Lambert & Associates v. United States,
 
 212 Ct.Cl. at 86-87.
 

 Essentially, plaintiff is urging this court to embrace an expansive view of our jurisdiction over tax refund suits. To adopt plaintiff’s view, however, would fly in the face of the statute and regulations that govern the grounds upon which a taxpayer may sue for a refund of taxes. One reason for requiring a taxpayer to specify the grounds for relief in its claim for a refund is to limit any subsequent litigation to those grounds that the IRS has already had an opportunity to consider and is willing to defend.
 
 Union Pacific Railroad v. United States,
 
 182 Ct.Cl. at 109, 389 F.2d at 442;
 
 see Forward Communications Corp. v. United States,
 
 221 Ct.Cl. at 623, 608 F.2d at 508. The case at bar presents precisely this sort of situation. To allow plaintiff to litigate the matter of the depletion deduction allowable for the testing sand would frustrate the purpose of the statute and regulations and would create an exception that would effectively nullify the substantial variance rule.
 

 Plaintiff has attempted to escape the effect of the substantial variance rule by arguing that it established its right to recover on the depletion deduction by timely filing a refund claim in which it challenged the IRS’s reduction of its rate of depletion. Plaintiff further asserts that the error made in computing the depletion deduction for the testing sand affects only the
 
 amount
 
 of recovery, not plaintiff’s
 
 right
 
 to recover, and that the court may properly consider the testing sand error. In support of its position, plaintiff relies on
 
 Red River Lumber Co. v. United States,
 
 134 Ct.Cl. 444, 446, 139 F.Supp. 148, 149-50 (1956). Although
 
 Red River Lumber
 
 does state that an error affecting only the amount of recovery may be raised at trial for the first time if the taxpayer has already established its right to recover by timely filing a refund claim, plaintiff’s reliance on the case is misplaced.
 

 The
 
 Red River Lumber
 
 case does not allow a taxpayer to introduce new factual bases of another ground for recovery for the first time at trial. This is essentially what plaintiff is attempting to use the case for. The computation of the gross income from mining figure for the testing sand is distinct from the issue concerning the appropriate rate of depletion raised in the refund claim. The erroneous gross income from mining figure constitutes a separate ground upon which plaintiff might have sought a refund had it been timely discovered. Certainly this error affected the amount of the depletion deduction and, in turn, the amount of plaintiff’s potential recovery. But it does so only insofar as any separate ground for a refund necessarily affects the amount a litigant may be entitled to recover. The
 
 Red River Lumber
 
 case is distinguishable from the present one. There, the figure allowed to be changed was the sales price — a figure integral to determining gain, which was an issue properly before the court. Here, however, plaintiff wishes to raise the issue of the gross income from mining for the testing sand, which is not at all related to the issue of the rate of depletion that had been properly raised.
 

 
 *1140
 
 There are many distinct tax issues under the general heading of depletion. Plaintiff may not confer on itself the right to litigate on any one of them by the simple expedient of including one depletion issue in its claim for a refund. The purpose of the variance rule is to limit, not expand, the issues subject to litigation in a tax refund suit.
 
 Union Pacific Railroad v. United States,
 
 182 Ct.Cl. at 108-09, 389 F.2d at 442. Unfortunately for plaintiff, it may not now raise the matter of the testing sand error and its effect on the depletion deduction or net operating loss deduction.
 

 CONCLUSION
 

 It is concluded that plaintiff is not entitled to a charitable contribution pursuant to 26 U.S.C. § 170 (1976) for its conveyance of a school site to the Oceanside-Carlsbad Union High School District. It is further concluded that the rule of variance precludes plaintiff from raising before this court any issues arising from its failure to properly compute the depletion deduction allowable for the Ottawa Testing Sand for the years here at issue. Accordingly, plaintiff’s petition must be dismissed.
 

 *
 

 Pursuant to the order of this court dated October 4, 1982, the Claims Court entered a final judgment in accordance with Trial Judge Colaianni’s recommended decision of April 7, 1982.
 

 [1]
 

 . The plaintiff raised several grounds for relief in its petition to this court. The parties have, by stipulation, agreed to dismiss the claim for interest paid or accrued on certain of plaintiffs indebtedness raised in paragraphs 6 and 7 of the petition and the issue of the rate of depletion raised in paragraph 8 of the petition. The latter stipulation does not include the issue of the computation of the proper gross income from mining nor defendant’s variance argument raised in response to this claim. Further, the parties have reached an agreement that will dispose of the substantive aspects of the depletion deduction and the net operating loss deduction once this court resolves the so-called variance issue.
 

 [2]
 

 . With regard to the San Luis Rey Freeway, construction of which was not to begin until 1973, the Pereira report states, at 11: “The State Division of Highways reports that although the route of the San Luis Rey Freeway (Highway 76) has been adopted and the locations of the major interchanges have been agreed upon, detailed engineering design has not taken high priority because of delays in the
 

 [3]
 

 . All references are to the Internal Revenue Code of 1954, as amended, Title 26 U.S.C., unless otherwise indicated.
 

 *
 

 To the same effect,
 
 see United States v. Transamerica Corp.,
 
 392 F.2d 522, 524 (9th Cir.1968) [added the Court of
 

 **
 

 See also United States v. Transamerica Corp.,
 
 392 F.2d 522, 524 (9th Cir.1968) [added by the Court of Appeals].
 

 [4]
 

 . The statute provides:
 

 “No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authori
 
 *1138
 
 ty, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.”
 

 26 U.S.C. § 7422(a).
 

 [5]
 

 . This is necessarily so because the error was not discovered by plaintiff or defendant until 1977, after the claims had been filed.
 

 [6]
 

 . This case does not present a situation in which the issue raised at the trial stage is derived from or is integral to the ground timely raised in the refund claim and thus may be considered as part of the initial ground.
 
 Cf. Union Pacific Railroad v. United States,
 
 182 Ct.Cl. at 109-10, 389 F.2d at 443 (citing instances in which subsidiary issues must necessarily have been considered as part of grounds in refund claim).