T.C. Memo. 2002-38


UNITED STATES TAX COURT


HAFFNER'S SERVICE STATIONS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16408-97.           Filed February 11, 2002.


<u>Joseph G. Aronson</u> and <u>Rufino Fernandez, Jr.</u>, for

petitioner.

<u>William F. Halley</u> and <u>Richard E. Buchbinder</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioner petitioned the Court to redetermine

respondent's determination of deficiencies in its 1990, 1991, and

1992 Federal income taxes and negligence accuracy-related

penalties under section 6662(a).[1]  For the respective years, respondent determined deficiencies of $877,861, $495,884, and $300,438 and accuracy-related penalties of $138,952, $69,965, and $33,423.

Following concessions,[2] we must decide the following three issues:

1.  Whether the bonuses petitioner paid during the subject years to two of its officers, Emile and Louise, were "reasonable" within the meaning of section 162(a)(1).  We hold they were not.

2.  Whether petitioner is liable for the accumulated earnings tax of $490,924, $240,902, and $130,438 determined by respondent for the respective years.  We hold it is.

3.  Whether petitioner is liable for the accuracy-related penalties determined by respondent.  We hold it is not.

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the subject years.  Rule references are to the Tax Court Rules of Practice and Procedure. Percentages are rounded.

[2] Among other things, petitioner has conceded that it paid $85,414 in legal fees during 1990 as a nondeductible personal expense of its controlling shareholder, Louise Haffner Fournier (Louise), and her husband, Emile Fournier (Emile).

## FINDINGS OF FACT[3]

Some facts were stipulated. We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith. We find the stipulated facts accordingly. Petitioner is a C corporation that timely filed Federal income tax returns for the subject years.

Background

Petitioner retails gasoline and related products (collectively, gasoline) and home heating oil in Massachusetts and New Hampshire. Petitioner sells its gasoline and home heating oil only for cash, and its service stations (stations) only sell gasoline. Petitioner's stations all display the name "Haffner's" and operate under the name Haffner's Service Stations, Inc.

---

[3] During trial, petitioner elicited testimony from its accountants (Seymour Rubin (Rubin) and George Goertz (Goertz)) and some of its faithful (to the Haffner/Fournier family), longtime employees (Peggy Willett (Willett), Mary Osgood (Osgood), Roland Beauchesne (Beauchesne), and E. Haffner Fournier (Haff)). We find unreliable much of the testimony of Rubin, Willett, Osgood, and Haff. We find much of their testimony to be vague and uncorroborated. We also find some of the testimony of Haff to be inconsistent with and/or contrary to the documentary evidence. Under the circumstances, we are not required to, and we do not, rely on the unreliable testimony of Rubin, Willett, Osgood, and Haff to support petitioner's positions herein. See Brookfield Wire Co. v. Commissioner, 667 F.2d 551, 552 (1st Cir. 1981), affg. T.C. Memo. 1980-321; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). See also Kenney v. Commissioner, T.C. Memo. 1995-431, where the Court declined to rely upon most of the testimony of the taxpayer and a long list of relatives and close friends who testified in support of her claim of innocent spouse relief.

Petitioner operates independently and competes directly with major oil companies by selling gasoline at a price lower than that of the stations of those companies.  For the respective subject years, petitioner's tax returns reported that its gross receipts were $61,359,783, $61,406,193, and $56,265,955, that its total income was $6,574,351, $5,203,710, and $3,704,259, and that its taxable income was $2,126,645, $1,283,987, and $985,747. Petitioner reported that its balance sheet at the end of those years and 1989 was as follows:

|  | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|
| Current Assets: |  |  |  |  |
| Cash | $2,508,283 | $3,526,942 | $3,495,498 | $4,245,727 |
| Accounts receivable | 1,596,322 | 495,332 | 456,686 | 433,204 |
| Inventory | 266,588 | 353,990 | 288,883 | 271,350 |
| Prepaid expenses | 671,566 | 1,061,716 | 1,019,877 | 748,286 |
|  | 5,042,759 | 5,437,980 | 5,260,944 | 5,698,567 |
| Long-term assets: |  |  |  |  |
| Property and equipment | 900,982 | 979,368 | 1,245,184 | 1,245,184 |
| Less: accumulated depreciation | (567,330) | (719,855) | (822,012) | (913,557) |
| Officers' life insurance: C.S.V. | 445,385 | 525,904 | 660,344 | 752,034 |
| Notes receivable | 35,155 | 1,126,777 | 1,575,929 | 1,643,343 |
| Investments | 189,589 | 304,915 | 327,579 | 367,158 |
|  | 1,003,781 | 2,217,109 | 2,987,024 | 3,094,162 |
| Total assets | 6,046,540 | 7,655,089 | 8,247,968 | 8,792,729 |
| Current liabilities: |  |  |  |  |
| Accounts payable | 91,420 | 146,040 | 98,985 | 114,959 |
| Other current liabilities | 687,682 | 850,341 | 572,962 | 442,175 |
|  | 779,102 | 996,381 | 671,947 | 557,134 |
| Long-term liabilities: |  |  |  |  |
| Mortgages and other debt | 210,560 | 210,560 | 233,735 | 210,560 |
| Equity: |  |  |  |  |
| Capital stock | 125,000 | 125,000 | 125,000 | 125,000 |
| Unappropriated retained earnings | 4,931,878 | 6,323,148 | 7,217,286 | 7,900,035 |
|  | 5,056,878 | 6,458,148 | 7,342,286 | 8,025,035 |
| Total liabilities and equity | 6,046,540 | 7,655,089 | 8,247,968 | 8,792,729 |

John F. Haffner (John) and his wife, Emma (Emma), started petitioner's business in or about 1940 as a single station, and the business has grown to include 13 stations (most of which are self-service and are staffed with relatively unskilled employees)

and the home heating oil business. John and Emma's family (Haffner/Fournier family) also owns other entities in addition to petitioner. The operating entities include petitioner, Haffner's Car Care (HCC), and Parker Fuel Corp. (Parker). HCC operates the car washes and vacuum cleaners located at some of petitioner's stations. Parker sells to petitioner, its only customer, all of the gasoline and home heating oil for resale to consumers. All three of these operating entities share employees. These labor cost are paid by petitioner and apportioned among these three operating entities by way of bookkeeping entries posted in intercompany accounts.

John and Emma's family also owns certain nonoperating entities. The nonoperating entities include Haffner Realty Trust (Haffner Realty), Fournier Realty Trust (Fournier Realty), and EMLO Realty Trust (EMLO Realty). Each of these three nonoperating entities was formed to hold properties transferred to it by the principals of the three operating entities mentioned above.

In its early years, petitioner had one class of stock. Four hundred and fifty shares of that stock were outstanding, and those shares were owned one-third each by John, Emma, and Louise, their only child. In 1949, John transferred 76 of his shares to Louise. Afterwards, Louise owned 226 shares, John owned 74 shares, and Emma owned the remaining 150 shares.

John died on March 10, 1955, and his 74 shares passed through his residuary estate to the John F. Haffner Trust (John's Trust). John's Trust benefited his and Emma's five grandchildren (the grandchildren); namely (in order from oldest to youngest), Haff, Jolyne H. Boyle (Jolyne), John Haffner Fournier (JH), Susan H. Baker-Spruce (Susan), and Richard Haffner Fournier (Richard). John's Trust provided that its principal and accumulated income would be distributed in equal amounts to each living grandchild when the youngest grandchild turned 21. Richard, the youngest grandchild, turned 21 on February 20, 1965. John's will provided that he had "purposely omitted a direct bequest to my daughter, Louise H. Fournier, because of provisions made for her during my lifetime" (e.g., his transfer to her of a majority of petitioner's shares). John intended through his testamentary scheme that Louise would be petitioner's majority shareholder and that each grandchild would be a minority shareholder.

Louise and her husband, Emile, were named in John's will as executors of John's estate, and they were formally appointed to that position by the Probate and Family Court Department of the Commonwealth of Massachusetts (probate court). Louise and Emile also were named trustees of John's Trust.

On December 20, 1956, petitioner recapitalized, doubling the number of voting shares held by each shareholder and issuing to each shareholder an additional 4 nonvoting shares for each voting

share then owned.  Later in 1956 and in 1957, Emma transferred 75 voting shares to Louise, 150 nonvoting shares to Emile, and 150 nonvoting shares to each grandchild.  Louise also transferred during that time 150 shares of nonvoting stock to Emile and 150 nonvoting shares to each grandchild.

Upon Emma's death in 1958, her remaining shares were placed in the Emma Haffner Trust (Emma's Trust).[4]  Louise was the executrix of Emma's estate and the named trustee of Emma's Trust.  On February 4, 1959, Emma's Trust transferred 75 of its voting shares to Louise, and Louise transferred 150 of her nonvoting shares to Emile and 150 nonvoting shares to each grandchild.  The voting shares were then owned 148 by John's Trust, 150 by Emma's Trust, and 602 by Louise.  The nonvoting shares were owned 592 by John's Trust, 300 by Emma's Trust, 8 by Louise, 450 by Emile, and 450 by each grandchild.

On August 1, 1959, Emma's Trust transferred its 150 voting shares to Louise.  On February 14, 1961, Louise transferred from John's Trust to herself the remaining 148 voting shares and 592 nonvoting shares (the 1961 transfer) as reimbursement for estate taxes which she had paid personally on behalf of John's estate.  After the 1961 transfer, Louise owned all 900 voting shares and 600 of the 3,600 nonvoting shares.  Emma's Trust owned 300 of the

_____

[4] The stipulation of facts incorrectly lists this trust as the Emma Fournier Trust.

nonvoting shares, and Emile and each grandchild owned 450 of the nonvoting shares.

Family Lawsuit

On or about November 21, 1989, Richard and Susan filed a complaint with the probate court against Emile and Louise, each individually and as executors of John's estate. The complaint alleged that Emile and Louise had breached their fiduciary duty as executors by failing to list properly the assets of John's estate (e.g., the shares underlying the 1961 transfer (disputed shares)) and by failing to distribute those assets in accordance with John's will. The complaint primarily sought rescision of the 1961 transfer, any costs (including attorney's fees) incurred by Richard and Susan in prosecuting the family lawsuit, and the return (with interest) of all unnecessary expenses incurred by John's estate (e.g., for income taxes, accountant's and attorney's fees, and filing fees).[5] Petitioner was not named as a defendant in the family lawsuit. Jolyne later joined the family lawsuit on or about June 6, 1995.[6]

---

[5] On or about Nov. 13, 1990, Richard and Susan amended the complaint primarily to allege further that Emile and Louise were also liable to them for self-dealing as executors of John's estate. The first amended complaint generally sought further damages in the form of a complete accounting of expenditures and financial information relating to the estate and to many of the Haffner/Fournier family entities.

[6] Haff never joined the family lawsuit, which he viewed as a family falling-out that rested on the plaintiffs' attempt to get

(continued...)

On June 7, 1996, the probate court ruled in favor of the plaintiffs, finding that Louise and Emile had breached their fiduciary duty by failing to carry out the terms of John's will, and rescinded the 1961 transfer.   By virtue of this ruling, petitioner's stock was thereafter owned as follows:

| Shareholder | Voting Stock Shares | Percentage | Nonvoting Stock Shares | Percentage |
|---|---|---|---|---|
| Louise | 752 | 83.56 | 8 | .22 |
| Emile | -0- | -0- | 450 | 12.50 |
| Haff | -0- | -0- | 450 | 12.50 |
| Jolyne | -0- | -0- | 450 | 12.50 |
| JH | -0- | -0- | 450 | 12.50 |
| Susan | -0- | -0- | 450 | 12.50 |
| Richard | -0- | -0- | 450 | 12.50 |
| Emma's Trust | -0- | -0- | 300 | 8.33 |
| John's Trust | 148 | 16.44 | 592 | 16.44 |
| | 900 | 100.00 | 3,600 | 100.00 |

The probate court's judgment also authorized John's estate: (1) To hire a certified public accountant (C.P.A.), at the expense of Emile and Louise, to ascertain the "present value" of the disputed shares, and (2) to distribute the disputed shares directly to the grandchildren.  The judgment also stated that Emile and Louise were responsible for the attorney's fees and costs incurred by the plaintiffs.

In 1997, Robert Minasian (Minasian), the then administrator of John's estate,[7] filed on behalf of the estate a separate

[6](...continued)
back at their parents for imposing strict standards on the plaintiffs' upbringing.

[7] On or about June 7, 1996, the probate court had removed Emile as executor of John's estate because he was unsuitable to act in that capacity.  His coexecutor, Louise, having died, the
(continued...)

lawsuit in the probate court against Emile, Haff, HCC, Parker, Haffner Realty, Fournier Realty, and EMLO Realty. Upon motion by the plaintiffs in the family lawsuit, the probate court consolidated that action with the family lawsuit and with another action that the plaintiffs had filed in that court against Louise and Emile, individually and as executors of Emma's will.[8] Each of the three separate lawsuits involved common questions of law and fact concerning the 1961 transfer.

Jerrold Katz (Katz) was the individual selected to value the shares of petitioner and certain of its related entities. Katz issued his report on October 16, 2000. The report concludes that the fair market value of petitioner, HCC, Parker, and a fourth operating entity organized after the subject years totaled $67.8 million as of December 31, 1998, and that the fair market values of the respective entities were approximately $29.3 million, $22.1 million, $10 million, and $6.87 million. The report expresses no conclusion as to the specific value of the disputed shares. To date, the parties to the family lawsuit have not formally indicated their positions on Katz's report, and the family lawsuit is still pending.

---

[7](...continued)
probate court appointed Minasian as the administrator of John's estate.

[8] On the same date that John had signed his will, Emma had signed a reciprocal will disposing of her estate in trust to the grandchildren.

Petitioner's Directors, Officers, and Other Noteworthy Employees

During each subject year, petitioner employed approximately 150 individuals, including Haff, Emile, and Louise. It did not have a written employment agreement with any of these individuals. Many of the employees, including Haff, Emile, and Louise, spent a significant amount of their time working on the business of HCC and Parker. Haff, Emile, and Louise also devoted a significant amount of their time to the business of the nonoperating entities owned by the Haffner/Fournier family.

Petitioners' directors during each subject year were Haff, Emile, and Louise. The directors did not hold formal board meetings but generally spoke with each other daily without memorializing their discussions. Haff, upon discussions with Emile and Louise in their capacity as board members, established petitioner's business plan and its employees' compensation. Haff, upon discussions with Emile and Louise in their capacity as board members, decided matters contributing to petitioner's growth in the industry (e.g., finding new locations at which to sell its products).

Petitioner's officers during the subject years were Haff, Richard, Emile, and Louise. Haff was president and CEO. Richard was vice president. Louise was treasurer. Emile was assistant treasurer and secretary. Emile and Louise were each about 80 years old at that time and receiving Social Security.

Haff began working for petitioner part time in 1951.  During the subject years, he was its general manager, working approximately 13 hours a day.  In that capacity, he set the price at which petitioner would sell its gasoline and home heating oil to its customers and made most of petitioner's other business decisions.  Haff received from petitioner compensation of approximately $742,400, $592,000, and $469,250 in the respective subject years.  Part of each year's compensation was apportioned to at least HCC and Parker, and petitioner claimed a deduction for the rest.

During the subject years, Emile opened petitioner's office each morning sometime between 4:30 a.m. and 5 a.m.  He also made bank deposits for some of the stations, collected items from all of the stations, and discussed many of the business decisions with Haff before Haff decided upon and implemented them.  Emile also helped answer the telephones and discussed home heating oil matters by telephone with various individuals.  Emile received from petitioner a weekly salary of $425.  Part of the salary was apportioned to at least HCC and Parker, and petitioner claimed a deduction for the rest.

During the subject years, Louise helped answer the telephones, took customer orders, drafted and signed checks, made bank deposits, conversed with customers and employees, and performed minor tasks around the office.  She also communicated

with petitioner's drivers delivering home heating oil, signed the subject Federal income tax returns in her capacity as an officer, and discussed some of the business decisions with Haff before he decided upon and implemented them. Louise received from petitioner a weekly salary of $450. Part of the salary was apportioned to at least HCC and Parker, and petitioner claimed a deduction for the rest.

Richard has worked for petitioner for approximately the last 40 years, with a 2-year absence to serve in the Army and another brief absence to earn a master's in business administration. He worked 5 days a week in the office, and he was responsible for monitoring each station's condition and collecting money from three of the stations. Richard received from petitioner a salary of approximately $50,000 in each of the last 10 years, and he has not received from petitioner a bonus since 1986 or 1987. Richard's bonus at that time was $5,000.

Willett began working for petitioner on January 6, 1978. She became the office manager in 1979 and remained with the company in that position throughout the subject years. She supervised the office personnel, hired and fired station employees and drivers, maintained the driver's reports, took orders, and handled service calls. She wrote deposit slips that Louise or Emile took to the bank, took customer complaints, and was responsible for maintaining the general ledger. She

completed much of the daily paperwork for petitioner's accountant's monthly visit and calculated each station's daily and monthly inventory. She received from petitioner a salary of approximately $50,000 in 1990.

Osgood has been petitioner's payroll bookkeeper since 1976. She reported directly to Haff but usually talked first to Willett before consulting him.

Beauchesne has worked for petitioner since 1973. During the subject years, he met Emile each morning to open the office. Beauchesne also supervised the truck drivers, did light maintenance at the stations, and supervised some of the employees at the stations.

Petitioner's Accountants

Rubin and Goertz are C.P.A.s who are, and for many years have been, petitioner's accountants. Goertz oversaw the preparation of petitioner's books and records, and he prepared petitioner's financial statements and income tax returns. For these purposes, Goertz traveled to petitioner's principal place of business in Lawrence, Massachusetts (Lawrence), once a month. While there, he met with Haff but never with Emile or Louise.

Rubin is responsible for petitioner's tax and business planning. Rubin usually met with petitioner's board members in Lawrence 1 day per month, and he usually conferred with them by telephone three to four times per week. Rubin never recommended

to petitioner that it pay a dividend, nor has petitioner ever paid a dividend.

Bonuses

Petitioner paid to Haff a $625,000 bonus in late 1990. On December 17, 1990, December 15, 1991, and December 17, 1992, petitioner paid identical bonuses of $625,000, $475,000, and $250,000, respectively, to Emile and Louise. Petitioner did not use a formula to decide the amount of any of these bonuses. Instead, Haff met with Rubin in December of each year to set the amounts of the bonuses primarily on the basis of petitioner's profit for the corresponding year. Haff, upon discussions with Emile and Louise in their capacity as board members, set the amounts of the bonuses at the amounts suggested by Rubin. Haff never discussed the payment of a dividend when he discussed the subject bonuses with Rubin, Emile, or Louise.

Petitioner apportioned to Parker and HCC $100,000 of each bonus paid to Louise and Emile in 1990 and 1991, and petitioner deducted as "Officers' Compensation" the remaining amounts paid to Louise and Emile. Petitioner deducted Haff's bonus as "Cost of Goods Sold". For the respective subject years, petitioner deducted the following types and amounts of compensation paid to Emile and Louise:

| Year | Payment Type | Emile | Louise | Total |
|------|-------------|-------|--------|-------|
| 1990 | Salary | $17,950 | $17,950 | $35,900 |
|      | Bonus | 525,000 | 525,000 | 1,050,000 |
|      |        | 542,950 | 542,950 | 1,085,900 |
| 1991 | Salary | 18,000 | 17,900 | 35,900 |
|      | Bonus | 375,000 | 375,000 | 750,000 |
|      |        | 393,000 | 392,900 | 785,900 |
| 1992 | Salary | 17,725 | 19,050 | 36,775 |
|      | Bonus | 250,000 | 250,000 | 500,000 |
|      |        | 267,725 | 269,050 | 536,775 |

Respondent determined that the bonuses which petitioner paid to Louise and Emile were unreasonable. Respondent did not adjust Haff's bonus because he worked long hours for the company as its general manager in charge of its operation.

Accumulated Earnings

On November 26, 1996, respondent mailed by certified mail to Goertz, petitioner's authorized representative, a notification under section 534(b) for 1990 through 1992.[9] On December 16, 1996, petitioner responded to the notification with a two-page letter. The letter referenced the family lawsuit and the probate court's ruling rescinding the 1961 transfer. Enclosed with the letter was a copy of the probate court's order rescinding the transfer and several cases which petitioner believed supported its position that the accumulation of earnings was not subject to the accumulated earnings tax determined by respondent. Also

---

[9] Respondent's notification erroneously lists 1989 through 1991 instead of 1990 through 1992. Respondent concedes that he has the burden of proof on excess accumulated earnings for 1992.

enclosed with the letter was Haff's signed statement declaring that the facts mentioned in the letter were true.

Rubin spoke with Haff regarding the accumulation of earnings during the subject years. Rubin advised Haff in 1989 that petitioner should not pay a dividend but should accumulate its funds possibly to redeem the disputed shares in the event that the plaintiffs prevailed in the family lawsuit. Petitioner's articles of incorporation provide with respect to the sale of petitioner's stock that

> Any stockholder, including the heirs, assigns, executors or administrators of a deceased stockholder, desiring to sell such stock owned by him or them, shall first offer it to the corporation through the board of directors in the manner following:

> He shall notify the directors of his desire to sell by notice in writing which notice shall contain the price at which he is willing to sell and the name of one arbitrator. The directors shall within thirty days thereafter either accept the offer, or by notice to him in writing name a second arbitrator, and those two shall name a third. It shall then be the duty of the arbitrators to ascertain the fair market value of the stock and if any arbitrator shall neglect or refuse to appear at any meeting appointed by the arbitrators, a majority may act in the absence of such arbitrator.

> After the acceptance of the offer, or the report of the arbitrators of the value of the stock, the directors shall have thirty days within which to purchase the same at such valuation, but if after the expiration of thirty days, the owner of the stock shall be at liberty to dispense of the same as he sees fit.

> No shares of stock shall be sold or transferred on the books of the corporation until these provisions have been complied with.

The Board of Directors may, however, waive these provisions in any particular instance.

During petitioner's audit, respondent issued an information document request (IDR) to Goertz, in his capacity as petitioner's authorized representative, asking him to state petitioner's reason for accumulating earnings.  Goertz responded that the accumulation related to the family lawsuit.

OPINION

1.  Compensation

We decide first whether section 162(a)(1) allows petitioner to deduct as reasonable compensation the bonuses paid to Emile and Louise.  Respondent determined that petitioner was not entitled to deduct those bonuses under section 162(a)(1) because they were not "reasonable".  Petitioner argues that the bonuses were reasonable under the independent investor test set forth by the Court of Appeals for the Seventh Circuit in Exacto Spring Corp. v. Commissioner, 196 F.3d 833, 835 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220.  Petitioner argues that the bonuses also were reasonable under the multifactor test set forth by the Court of Appeals for the Ninth Circuit in Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245-1248 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282.  Petitioner argues it paid the bonuses to Emile and Louise also intending to compensate them for past services.

Absent the parties' stipulation to the contrary, this case is appealable to the Court of Appeals for the First Circuit. Sec. 7482(b)(1) and (2).  Thus, we shall apply that court's jurisprudence to the extent it is squarely in point.  Golsen v. Commissioner, 54 T.C. 742, 757 (1970) ("better judicial administration requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone"), affd. 445 F.2d 985 (10th Cir. 1971); see also Lardas v. Commissioner, 99 T.C. 490, 494-495 (1992) (Golsen rule should be construed narrowly and applied only if "a reversal would appear inevitable, due to the clearly established position of the Court of Appeals to which an appeal would lie").  We have found no case of the Court of Appeals for the First Circuit that squarely addresses the disputed compensation issue; nor have the parties referenced one. Accordingly, as a national court, we analyze this issue on the basis of our view of the law.

The compensation issue focuses on section 162(a)(1).[10]  A payment of compensation is deductible under that section if it is reasonable in amount and for services actually rendered to the payor in or before the year of payment.  <u>Lucas v. Ox Fibre Brush Co.</u>, 281 U.S. 115, 119 (1930); <u>Charles Schneider & Co. v. Commissioner</u>, 500 F.2d 148, 151 (8th Cir. 1974), affg. T.C. Memo. 1973-130; <u>Pac. Grains, Inc. v. Commissioner</u>, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; <u>Estate of Wallace v. Commissioner</u>, 95 T.C. 525, 553-554 (1990), affd. 965 F.2d 1038 (11th Cir. 1992); sec. 1.162-7(a), Income Tax Regs.  Petitioner must prove that section 162(a)(1) allows it to deduct compensation in an amount greater than that determined by respondent.  Rule 142(a)(1).  Careful scrutiny of the facts is appropriate in a case such as this where the payor is controlled by a payee/employee.  <u>Paul E. Kummer Realty Co. v. Commissioner</u>, 511 F.2d 313, 315-316 (8th Cir. 1975), affg. T.C. Memo. 1974-44; <u>Charles Schneider & Co. v. Commissioner</u>, <u>supra</u> at 152-153; <u>Law Offices-Richard Ashare, P.C. v. Commissioner</u>, T.C. Memo.

---

[10] That section provides:

> SEC. 162(a).  In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--
>
> > (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

1999-282.  We must be persuaded that the purported compensation was paid for services rendered by the employees/shareholders, as opposed to a distribution of earnings to them that the payor could not deduct.  Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153 (and the cases cited therein).

Reasonable compensation is determined by comparing the compensation paid to an employee with the value of the services performed in return.  Such a determination is a question of fact that is made as to each employee individually, rather than as to the compensation paid to a group of employees collectively. Pulsar Components Intl., Inc. v. Commissioner, T.C. Memo. 1996-129; Mad Auto Wrecking, Inc. v. Commissioner, supra.  The cases concerning reasonable compensation are numerous and usually list many factors to be considered in making this factual determination.  As relevant herein, the factors include:  (a) The employee's qualifications; (b) the nature, extent, and scope of the employee's work; (c) the size and complexity of the employer's business; (d) a comparison of salaries paid with the employer's gross and net income; (e) the prevailing general economic conditions; (f) a comparison of salaries with distributions to shareholders and retained earnings; (g) the prevailing rates of compensation for comparable positions in comparable companies; (h) the salary policy of the employer as to all employees; (i) the amount of compensation paid to the

particular employee in previous years; and (j) whether the employer offers a pension plan or profit-sharing plan to its employees. See Mad Auto Wrecking, Inc. v. Commissioner, supra (and the cases cited therein). Recently, the Court of Appeals for the Seventh Circuit has expressed its disagreement with a multifactor test, opting instead to rest its analysis of the reasonableness of compensation primarily on whether an independent investor would have approved of the amount of compensation paid to the employee. Exacto Spring Corp. v. Commissioner, 196 F.3d at 838-839. The court observed that the Courts of Appeals for the Second and Ninth Circuits have concluded somewhat differently by requiring that the various factors of the traditional test be analyzed from the perspective of an independent investor. Id. at 838; accord Eberl's Claim Serv., Inc. v. Commissioner, 249 F.3d 994, 1003-1004 (10th Cir. 2001) (court rejected independent investor test in lieu of a multifactor approach), affg. T.C. Memo. 1999-211. Our jurisprudence has also applied a multifactor test through the lens of an independent investor, in the setting of a case that was not appealable to a circuit that had already recognized such an application. Wagner Constr., Inc. v. Commissioner, T.C. Memo. 2001-160 (venue was the Eighth Circuit); see also Tricon Metals & Servs., Inc. v. Commissioner, T.C. Memo. 1997-360. We follow

that jurisprudence here and apply the multi factor test through the lens of an independent investor.[11]

At the trial of this case, Jay Fishman, ASA, CBA (Fishman), was called by petitioner as a witness, and the Court, with no objection from respondent, recognized him as an expert on reasonable compensation. Petitioner introduced into evidence Fishman's expert report (written under the name of his employer, Financial Research, Inc.) as to the reasonableness of the total compensation paid to Haff, Emile, and Louise. The report concludes on the basis of the aggregate compensation paid to the three individuals that "the deductions claimed by Haffner's Service Stations, Inc. for compensation paid to Emile and Louise Fournier for the years ended December 31, 1990, 1991, and 1992 are reasonable deductions for compensation and not distributions of profits." As discussed infra, the report is premised on Fishman's belief that the specific compensation paid to each officer of a corporation is reasonable when the total compensation paid to all of the corporation's officers is reasonable.

Expert testimony is appropriate to help the Court understand an area requiring specialized training, knowledge, or judgment.

---

[11] As discussed herein, we decide this test adversely to petitioner. Even if we had applied one of the tests argued for by petitioner, petitioner would still not have prevailed. Neither Emile nor Louise made a significant contribution during the subject years to the success of petitioner's business.

Fed. R. Evid. 702; Snyder v. Commissioner, 93 T.C. 529, 534 (1989).  The Court, however, is not bound by an expert's opinion. We weigh an expert's testimony in light of his or her qualifications and with respect to all credible evidence in the record.  Depending on what we believe is appropriate under the facts and circumstances of the case, we may either reject an expert's opinion in its entirety, accept it in its entirety, or accept selected portions of it.  Helvering v. Natl. Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994); Parker v. Commissioner, 86 T.C. 547, 562 (1986).

We reject most of Fishman's testimony.  For the three reasons set forth below, we are unimpressed with his conclusion and its underlying rationale.  First, he reached his conclusion relying primarily upon:  (1) Specific data that he received mainly from Haff[12] and (2) general data that he derived from a statistical compilation by Robert Morris Associates (Robert Morris).  Fishman independently verified none of this data, relying blindly upon it.  As to the specific data, Haff is clearly an interested party given his relationship to petitioner and his pecuniary interest in the outcome of this case.  We find disturbing that Fishman, while acknowledging to the Court that he

---

[12] Fishman also spoke with Emile, Willett, Osgood, Beauchesne, and petitioner's accountants.

was concerned about Haff's conflict of interest, relied upon data supplied by him without performing any meaningful independent verification of it.[13] Fishman acknowledged at trial that critical "facts" that entered into his conclusion as to the reasonableness of the total compensation were his understandings that Louise performed "extensive duties" for petitioner during the subject years and that Louise and Emile did not spend extensive time working for any other entity. The facts at hand disprove both of these "facts". Fishman also inappropriately ascertained his specific data for the period 1988 through 1993 and made no meaningful attempt to limit that data to the subject years. As he testified at trial with respect to the specific data that he received from Willett:

> The Court: Why are we talking about '88? If the year starts with '90, why are we doing '88?

> The Witness: I wanted a predicate when I did my financial analysis. I looked at five years. I looked longer, actually.

> The Court: But for the purpose of determining reasonable compensation, I think we ought to focus in on the years at issue.

> The Witness: And that encompasses that. She [Willett] says '89 to '93.

---

[13] Such an actual and glaring conflict of interest is also held by the other employees and the accountants with whom Fishman spoke to obtain specific data. Each of those individuals has been connected with petitioner and its officers for many years and stood to gain from a personal and/or business point of view should petitioner prevail in this litigation.

The Court:  It encompasses it, but the concern that I have, though, Mr. Fishman, is that it could be that she [Louise] did a great deal during 1988 and didn't do anything in '91.  And there is no way to confirm that from what you're saying; isn't that right?

The Witness:  Other than speaking to her, that's correct.[14]

Fishman's blind reliance on the specific data is especially exemplified by the following colloquy between Fishman and the Court:

The Court:   When he described to you that Louise Fournier negotiated fuel purchases, * * * did you come to understand that she did that every day, every week, every month, every year?  How often did that happen?

The Witness:  I don't know.

The Court:  * * * you indicate that she managed the Company's banking relationships.

The Witness:  Yes.

The Court:  Where did you get that information, the same source?

The Witness:  Yes.

The Court:  Did you independently verify that?

The Witness:  No.

The Court:  What banking relationships did she manage?

The Witness:  I think they were the day-to-day banking relationships, the signing of the checks —-

The Court:  That's more ministerial.

---

[14] And speaking to Louise was not possible because she was dead.

The Witness:  It is.

The Court:  Did she negotiate any loans?

The Witness:  I don't think so.

The Court:  So when you say manage the banking relationships, what's the relationship?   I'm not understanding what you mean by relationship.  That she made deposits; is that what you're saying?

The Witness:  Your honor, there was in 1982, '83, '84, where, in fact, they did--

The Court:  Yes, but I'm talking about the years in issue now, '90, '91, and '92.  Were there any banking relationships that she managed?

The Witness:  I guess I don't know the answer to that.

The Court:  * * * now, then you say that another role that she had was that she supervised employees.

The Witness:  Yes.

The Court:  What employees did she supervise?

The Witness:  Peggy Willett, Mary Osgood--

          *      *      *      *      *      *      *

The Court:  So, how did she supervise these employees?  * * * describe it to me.  When you say that she supervised them, what did she do to supervise them?

The Witness:  She made policy decisions with regard to things that had to be done, and she made sure that --

The Court:  Give me an example of a policy decision.

The Witness:  You know what?  I can't give you a particular one.

The general data suffers from similar infirmities. In addition to the fact that Fishman acknowledged at trial that the general data was unreliable, he stated specifically that he knew that Robert Morris's publication warns readers explicitly that the data is not statistically accurate and should not be relied upon or used in a legal proceeding. Fishman attempted to rationalize his reliance on the Robert Morris compilation by stating: "Unfortunately, I had to use what was available. It was that and the--were the best stuff around. I have to concede that they're flawed." We find this attempt unavailing.

Much of the purported data that Fishman relied upon in reaching his conclusion also never made its way into evidence. Although an expert need not rely upon admissible evidence in forming his or her opinion, Fed. R. Evid. 703, we must rely upon admitted evidence in forming our opinion and, in so doing, may not necessarily agree with an expert whose opinion is not supported by a sufficient factual record. The mere fact that the Court admits an expert's opinion into evidence does not mean that the underlying facts upon which the expert relied are also admitted into evidence. Anchor Co. v. Commissioner, 42 F.2d 99 (4th Cir. 1930); Rogers v. Commissioner, 31 B.T.A. 994, 1006 (1935); see United States v. Scheffer, 523 U.S. 303, 317 n.13 (1998) (whereas expert opinion is considered evidence, the facts upon which such an expert relies in forming that opinion are not

considered evidence until introduced at trial by a fact witness); see also United States v. 0.59 Acres of Land, 109 F.3d 1493, 1496 (9th Cir. 1997).  In a case such as this, where an expert witness relies upon facts which are critical to the Court's analysis of an issue, we expect that the party calling the witness will enter into evidence those critical facts.  Petitioner did not.  Petitioner, in short, asks us to close our eyes to the non-expert-opinion evidence and to adopt without adequate verification Fishman's conclusion and the representations upon which he relied.  We decline to do so.  Whereas we may determine the reasonableness of compensation with the assistance of experts if we consider it helpful, we will not accept an expert's conclusion when it is based on premises unsupported by the record.

Our second concern with Fishman's conclusion is that he inexplicably neglected to take into account properly the "significant" flaws in the Robert Morris compilation that he acknowledged upon cross-examination had influenced his opinion.  The compilation, for example, did not reflect the fact that the salary of a person in one part of the country may be different than the salary of a person performing the same services in another part of the country.  Nor did the compilation reflect the number of corporate officers in a particular category.  As to the latter flaw, Fishman stated, he listed the responsibilities of

Haff, Emil, and Louise collectively, rather than individually, and he drew no distinction among Haff, Emile, and Louise as to the reasonableness of each individual's compensation. To Fishman's mind, each officer's compensation is reasonable under section 162(a)(1) if the aggregate amount of compensation is reasonable for the services performed by all of the officers. We disagree. In fact, even Fishman recognized the impropriety of his approach when he answered the Court's question as to why he included Haff's compensation in the analysis of the reasonableness of Emile and Louise's compensation. The colloquy went as follows:

> The Court: by including the third person and including that salary in here, we're throwing into this mix something that is not relevant. I mean, suppose, for instance, the third person's salary was $10,000? Or suppose it was $500,000? It certainly has an impact, and it distorts the comparison?
>
> The Witness: I understand your point, and it would have been better if I had made an allocation by individual. I didn't think I could do that and sit here and talk to you about it.

We also note that Fishman, notwithstanding his knowledge of the fact that Emile and Louise received equal bonuses, believed that Louise performed significantly more services for petitioner than Emile and acknowledged that some of Louise's duties could have been performed by somebody else for significantly less than the amount paid to Louise.

Our third concern with Fishman's conclusion is that he reached it by comparing petitioner to four publicly traded companies none of which was actually comparable to petitioner. Each company is significantly larger than petitioner, both in size and in revenue, and none of those companies, unlike petitioner, is a discount operation that aims to charge less than a typical retail oil company. The four companies also are located in different geographical areas than petitioner, have convenience stores, accept credit card payments, and are more heavily debt leveraged. Their officers also have significantly different responsibilities than petitioner's officers. To be sure, as Fishman acknowledged in reply to a question from the Court:

> The Court: * * * Now, let's talk again about your comparisons to the public companies. And I understand that in the field of valuation, how one uses public companies for comparison purposes. But these companies are a stretch, don't you think, to try to substantiate reasonableness of compensation, based on three top individuals in public companies?

> The Witness: * * * I will tell you, are they the best comparable that I could--they are the best comparable that I could find. In a perfect world, would they be the ones that I would rather use? No.

Having rejected Fishman's conclusion in its entirety, and having rejected much of his rationale, we now turn to the various factors on reasonable compensation and analyze them seriatim through the eyes of a hypothetical independent investor. As to each factor, we ask ourselves the following question (the

question):  "Would a hypothetical independent investor consider the factor favorably to require the payment of the bonuses to the employee in order to retain the services which the employee performed during the subject years?"  An answer in the negative indicates that the payment of a bonus was not sufficiently tied to the employee's services to constitute personal service income but was more likely a distribution of earnings.  An answer in the affirmative supports deducting the bonuses as personal service compensation.  The reasonableness of the amount of the employee's compensation (inclusive of the bonuses) then hinges on whether the hypothetical independent investor, after taking into account the amount of the compensation, would receive at least the minimum return anticipated on an investment in the employer.

### a.  Employee's Qualifications

We analyze the qualifications of Emile and Louise.  Each has worked in petitioner's business since its inception, and each understands petitioner's operation well.  Petitioner's profitability during the subject years, however, did not rest upon the personal qualifications of Emile or Louise but rested more appropriately upon the volume of its sales, which, in turn, hinged on the price at which petitioner sold its gasoline and home heating oil.  In the particular industry of which petitioner was a part, the marginal skills of Emile and Louise were not critical to petitioner's profitability.  Neither Emile's nor

Louise's personal services were vital to petitioner's operation during the subject years, and neither of them was irreplaceable in petitioner's operation or in the maximization of its profit. Nor was the level of petitioner's sales sufficiently connected with the presence of either of them. A significant number of petitioner's customers did not frequent its stations or purchase its home heating oil on account of Emile or Louise. Although we assume that Emile's and Louise's personal efforts had a meaningful impact on petitioner's growth during its early years, the record simply does not persuade us that either of them contributed significantly during the subject years to any additional growth. As to both Emile and Louise, we answer the question in the negative.

b. Nature, Extent, and Scope of Employee's Work

We analyze the nature, extent, and scope of Emile and Louise's work in petitioner's business. Neither the nature, extent, nor scope of that work was fundamental, substantial, or all encompassing. Haff was the locomotive of the business, and he was petitioner's most valuable employee in that, among other things, he set the price at which petitioner would sell its gasoline and home heating oil and made most of the other important everyday business decisions. Although Emile and Louise discussed many of the business decisions with Haff before he passed on those decisions, we are unable to find that either

Emile or Louise rendered any significant advice to Haff in the capacity as an employee (as opposed to a director) that was necessary or significant enough to distinguish Emile and Louise from petitioner's other employees. In fact, the record reveals that Emile and Louise performed during the subject years mainly the type of clerical, nonmanagerial work that could be performed by the staff employees of an office. The record also reveals that both Emile and Louise devoted significantly less than 100 percent of their time to petitioner, given the fact that each of them worked significant hours on the business of the related entities of the Haffner/Fournier family.

Nor do we believe that petitioner's business would have suffered had Emile or Louise severed his or her affiliation with the company. Any void created by the loss of Emile and/or Louise could have been filled by one or more other employees. Emile's and Louise's circumstances in this case are fairly common in the world of closely held business. Presumably, they were vibrant, energetic, and highly productive individuals in petitioner's earlier years, when its business grew and became successful. In order to manage that growth, however, they developed an organizational structure that included the next generation of managers and support staff. Throughout the years, Emile's and Louise delegated many of their managerial responsibilities to the new organization so that Emile's and

Louise's responsibilities diminished over time to almost nothing. During the subject years, the new organization and next generation of management capably managed the business so that Emile and Louise had little to do but to sit back and observe. Their roles, once as active managers, now were more passive and less critical with respect to the business's daily affairs. For example, Haff was the only one who regularly met with the accountants during the subject years in a capacity other than as a board member. As to both Emile and Louise, we answer the question in the negative.

c. Size and Complexity of Employer's Business

We analyze the size and complexity of petitioner' business. We conclude that petitioner's business is neither complex nor relatively large. Petitioner retails commodities (gasoline and home heating oil), and its retail operation demands only routine managerial skills. In fact, petitioner's business was somewhat rudimentary in that it only sold gasoline and home heating oil, that it purchased all of its inventory from a single supplier, and that it sold its gasoline only for cash.

Petitioner's success and survival hinged on its ability to maintain enough supply to meet consumer demand and its ability to sell that supply at a price that would appeal to consumers while allowing petitioner to reap a meaningful profit. The most important aspects of petitioner's business involved, first, the

cost and quantity of the gasoline and home heating oil which it would purchase from Parker and, second, the price at which it would sell those products to consumers. Whereas petitioner (through Haff) set the price at which it would sell its products to its customers, the record establishes that petitioner had few negotiations with Parker as to petitioner's cost of those products. Petitioner also played no part in the negotiations of the cost and quantity of those products purchased by Parker for resale to petitioner. The negotiations, obviously, occurred between Parker and the third party from which it purchased the products. Although petitioner's business could be viewed as somewhat large in the sense that it employed approximately 150 individuals and generated approximately $60 million of gross receipts, the fact of the matter is that petitioner's business was relatively small when compared to the industry's "comparable" businesses. As to both Emile and Louise, we answer the question in the negative.

d. Comparison of Salaries Paid With Net and Gross Income

For each of the subject years, we compare Emile's and Louise's compensation, including bonuses, first to petitioner's gross income and then to its taxable income (before any deduction for the relevant employee's compensation). As to Emile, the first comparison yields percentages of 8.26, 7.55, and 7.23, respectively, and the second comparison yields percentages of

20.34, 23.44, and 21.36, respectively.  In the case of Louise, the first comparison yields percentages of 8.26, 7.55, and 7.26, respectively, and the second comparison yields percentages of 20.34, 23.43, and 21.44, respectively.

We believe all four sets of percentages are rather high seeing that petitioner employed approximately 150 individuals and given our findings as to the qualifications of Emile and Louise and the nature, extent, and scope of their work.  We also bear in mind our finding that petitioner did not ascertain Emile's and Louise's bonuses on the basis of their contribution to it, but rather on the size of its profits for the related years.  We note further that the percentages for both sets of comparisons are relatively the same for Emile and Louise.

We are not unmindful that petitioner reported large amounts of taxable income for each subject year, notwithstanding its payment of large amounts of compensation to Emile and Louise. The mere fact that a corporation has substantial taxable income in a given year, however, does not necessarily mean that a hypothetical independent investor would approve of what an employee received as compensation.  Such is especially true as to Emile and Louise who, as mentioned above, were not indispensable to the business and whose efforts during the subject years did not result significantly in the generation of that income.  As to both Emile and Louise, we answer the question in the negative.

e.  General Economic Conditions

We analyze the general economic conditions related to the relevant business.  General economic conditions may affect a business's performance and indicate the extent (if any) of the employee's effect on the company.  Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119-120 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court dated Nov. 16, 1948.  Adverse economic conditions, for example, tend to show that an employee's skill was important to a company that grew during the bad years.

The record does not indicate whether petitioner's success during the subject years was attributable to the work of one or more employees or to the general economic conditions.  The record indicates, however, that the economic conditions related to petitioner's business were not adverse.  As to both Emile and Louise, we are unable to answer the question affirmatively.

f.  Comparison of Salaries with Distributions to Shareholders and Retained Earnings

We compare Emile's and Louise's compensation first to petitioner's distributions and then to its retained earnings.  The fact that petitioner has never paid a dividend is a factor that may suggest that some portion of the amounts paid as compensation to a shareholder/employee is really a dividend.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1322-1323 (5th Cir. 1987), affg. T.C. Memo. 1985-267; see also

O.S.C. & Associates, Inc. v. Commissioner, 187 F.3d 1116, 1121 (9th Cir. 1999), affg. T.C. Memo. 1997-300. Such an absence may raise a red flag that invites special scrutiny by the Court and justify an inference that some of the purported compensation was actually a distribution of profits. Charles Schneider & Co. v. Commissioner, 500 F.2d at 153.

Such an absence and inference, however, does not automatically convert compensation that would otherwise be reasonable into a dividend. Corporations are not required to pay dividends. Instead, an individual shareholder may participate in the success of a corporation through the appreciation in the value of his or her stock brought on by retained earnings and the possibility of a future return. Thus, a corporate employer with little or no dividend history may be able to pay and deduct large amounts of compensation if the Court is convinced that a reasonable person would still have invested in the corporation. Critical to this test is whether the shareholders of the corporation received a fair rate of return (without taking into account any compensation paid to them) from the total of their initial and subsequent investments. Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327; Medina v. Commissioner, T.C. Memo. 1983-253; see also Rev. Rul. 79-8, 1979-1 C.B. 92 (compensation is not unreasonable merely because a corporation pays an insubstantial portion of its earnings as dividends).

The record does not contain enough information for us to conclude that a reasonable person would have invested in petitioner, given the payments of the large amounts of compensation to Emile and Louise. Nor does the record allow us to determine with any meaningful precision the rate of return that a hypothetical investor would have received during the subject years on his or her investment in petitioner.[15] As to both Emile and Louise, we are unable to answer the question affirmatively.

### g.  Prevailing Rates of Compensation for Comparable Positions in Comparable Companies

The record does not disclose the prevailing rates of compensation for comparable positions in comparable companies. As to both Emile and Louise, we are unable to answer the question affirmatively.

---

[15] Even if we could make a fair approximation of the rate of return that a hypothetical investor would have received during the subject years on his or her investment in petitioner, the record contains no evidence as to what an investor would expect as a rate of return in light of the risks of the business. Moreover, even if the return on capital actually achieved by petitioner were high enough to satisfy an independent investor, this would not carry the day, in the absence of proof, which is lacking here, that the profits are attributable to the efforts of Emile and Louise. Cf. B & D Foundations, Inc. v. Commissioner, T.C. Memo. 2001-262 (citing Exacto Spring Corp. v. Commissioner, 196 F.3d 833, 839 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220).

h.  Employer's Salary Policy as to All Employees

We analyze petitioner's salary policy as to all of its employees.  The record establishes that both Emile and Louise were compensated differently than the other employees, most likely because of Louise's status as the controlling shareholder.  Apart from Emile, Louise, and, in 1990, Haff, none of petitioner's employees received a large bonus for any subject year.  Nor does the record indicate that any of petitioner's other employees, except for Haff, the president, CEO, and general manager of the company, received six-figure compensation in any one year.  We also note that Emile and Louise, by virtue of their positions as corporate officers and directors, and by virtue of Louise's relationship to the company as its controlling shareholder, were not dealing with petitioner at arm's length.  As to both Emile and Louise, we answer the question in the negative.

i.  Compensation Paid in Prior Years

We analyze the compensation that petitioner paid to Emile and Louise in years prior to the subject years.  An employer may deduct compensation paid to an employee in a year although the employee performed the services in a previous year.  Lucas v. Ox Fibre Brush Co., 281 U.S. at 119; see also R. J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50-51 (1972) (and the cases cited thereat).  In order to do so, the employer must show:  (1) That

the employer intended to compensate the employee for past undercompensation, and (2) the amount of the undercompensation. Pac. Grains, Inc. v. Commissioner, 399 F.2d at 606; Estate of Wallace v. Commissioner, 95 T.C. at 553-554.

We conclude that none of the payments in issue were intended to compensate either Emile or Louise for past undercompensation. In addition to the fact that petitioner alleged in its petition that the compensation was all attributable to the efforts of Emile and Louise during the subject years, the payment of the extremely large bonuses to them began in 1990, around the time that the family lawsuit was initiated. Petitioner's payment of these large amounts of cash obviously reduced its value and, correspondingly, the amount of petitioner's value that was attributable to the disputed shares. In their capacity as defendants in the family lawsuit, Emile and Louise, the recipients of the bonuses, also were most likely incurring large expenses in defending against the lawsuit and were facing the possibility of a large damage award by virtue of an adverse ruling against them. We also observe that petitioner had sufficient resources in 1989 and in each of the subject years to pay Emile and Louise any additional amount that it purportedly believed was due to them for their services, that the bonuses were ascertained arbitrarily at the end of each year, and that

the same amounts were paid as bonuses to Louise and Emile.  As to both Emile and Louise, we answer the question in the negative.

### j.  Absence of Pension Plan/Profit-Sharing Plan

We analyze whether petitioner had a pension plan or profit-sharing plan.  The absence of a pension plan or profit-sharing plan may allow an employer to pay an employee more compensation than the employer would have paid had the employer offered the employee either of those plans.  Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407.

Petitioner had a pension plan, but we do not know who its participants were.  As to both Emile and Louise, we are unable to answer the question affirmatively.

### k.  Conclusion

We conclude that the bonuses paid to Emile and Louise in the subject years were unreasonable in that they were not actually paid for personal services rendered.  Accordingly, we sustain respondent's determination as to this issue.

### 2.  Accumulated Earnings Tax

We turn next to the applicability of the accumulated earnings tax.  Respondent determined that the tax applies to each year in issue.  Petitioner contends that the tax applies to none of those years.  Petitioner asserts that it accumulated earnings during those years to redeem the disputed shares.  Petitioner

argues that an accumulation for that purpose was a reasonable business need. Respondent rejoins that an accumulation for that purpose is not a reasonable need of petitioner's business. Petitioner takes no exception to respondent's calculation of the accumulated earnings tax but for its dispute as to the reasonable needs of its business.

Section 531 imposes a penalty tax on the accumulated taxable income of a corporation that is availed of for the purpose of avoiding tax with respect to its shareholders by permitting earnings and profits (earnings) to accumulate instead of distributing them. Secs. 531 and 532(a). The purpose of the penalty tax is to compel the corporation to distribute any earnings not needed for its business so that its shareholders will pay income taxes on the dividends received. See Ivan Allen Co. v. United States, 422 U.S. 617, 626 (1975); United States v. Donruss Co., 393 U.S. 297, 303 (1969); Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 699 (1943). The fact that earnings have accumulated beyond the reasonable needs of a business establishes a presumption that the accumulation was motivated by tax avoidance. Sec. 533(a).

The reasonable needs of the business include reasonably anticipated future needs. Sec. 1.537-1(a), Income Tax Regs. In order to meet the reasonable needs of the business test, a need to retain earnings must be directly connected with the needs of

the corporation itself and must be for bona fide business purposes. Id. The regulations provide a "prudent businessman" test to determine whether earnings have been accumulated beyond the business's present and reasonably anticipated future needs. Under this test, "An accumulation of the earnings and profits * * * is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonable anticipated future needs of the business." Id.

The determination of the reasonable needs of a business is in the first instance a question for the corporation's officers and directors, and courts should only reject the officers' and directors' judgment to accumulate earnings where the facts and circumstances warrant the conclusion that an earnings accumulation is unreasonable and for tax-motivated purposes. Snow Manufacturing Co. v. Commissioner, 86 T.C. 260, 269 (1986); Atl. Props., Inc. v. Commissioner, 62 T.C. 644, 656 (1974), affd. 519 F.2d 1233 (1st Cir. 1975). The mere fact that a corporation's officers and/or directors have consciously decided to retain earnings for a stated anticipated future need, however, does not necessarily mean that an accumulation for that need satisfies the reasonable needs of the business test. A corporation must justify an accumulation for reasonably anticipated future needs by demonstrating, as of the end of each relevant year, a specific, definite, and feasible plan to use the accumulation to meet the stated need within a reasonable time.

Sec. 1.537-1(b), Income Tax Regs. In recognition of the informality which commonly characterizes planning within a closely held corporation, however, neither the regulations nor the cases require meticulously drawn formal blueprints for action. Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 332 (1968); Bremerton Sun Publg. Co. v. Commissioner, 44 T.C. 566, 584-585 (1965). But where documentation is lacking, the intention to dedicate corporate resources to identified business needs must be unambiguously evidenced by some contemporaneous course of action toward this end. Cheyenne Newspapers, Inc. v. Commissioner, 494 F.2d 429, 433-434 (10th Cir. 1974), affg. T.C. Memo. 1973-52; Snow Manufacturing Co. v. Commissioner, supra at 273-277; Ellwest Stereo Theatres, Inc. v. Commissioner, T.C. Memo. 1995-610.

Section 534 lists two situations in which the Commissioner bears the burden of proving that earnings have accumulated beyond the reasonable needs of the business. First, the Commissioner bears the burden of proof when the Commissioner fails to notify the corporation before issuing a notice of deficiency to it that the notice of deficiency includes an amount for the accumulated earnings tax. Second, the Commissioner bears the burden of proof when the corporation responds timely to the Commissioner's notification with a statement that explains the grounds, with facts sufficient to show the basis thereof, on which it relies to establish that the accumulation was for the reasonable needs of

the business.  See <u>Myco Indus., Inc. v. Commissioner</u>, T.C. Memo.
1992-147.

Petitioner argues that respondent bears the burden of proof
in all years by virtue of the December 16, 1996, letter.
Respondent concedes that he bears the burden of proof for 1992,
with respect to whether petitioner allowed its earnings to
accumulate beyond the reasonable needs of the business, but
argues that petitioner bears the burden of proof for the
remaining years.  We agree with neither side in full.  We hold
that respondent bears the burden of proof as to the grounds set
forth in the December 16, 1996, letter on which petitioner relies
to establish that its accumulation of earnings did not exceed the
reasonable needs of its business.  We hold that petitioner
continues to bear the burden of proof with respect to any
additional grounds that it alleges were the reason for the
accumulation, as well as with respect to the ultimate question of
whether petitioner was availed of for a tax-motivated purpose.[16]
<u>Pelton Steel Casting Co. v. Commissioner</u>, 28 T.C. 153, 183-184
(1957), affd. 251 F.2d 278 (7th Cir. 1958); see also <u>Wellman
Operating Corp. v. Commissioner</u>, 33 T.C. 162, 182 (1959).

We read the December 16, 1996, letter to have alerted
respondent that petitioner was asserting that it had accumulated
earnings during the subject years for a planned stock redemption

---

[16] Notwithstanding our holdings as to which party bears the
burden of proof on this issue, none of our holdings as to the
related substantive issue hinges on the burden of proof.

connected to the family lawsuit.  The letter characterized the family lawsuit plaintiffs as "dissident and hostile minority" shareholders and asserted that they "cannot function as part of a unified team".  The letter indicated that petitioner planned to redeem the shares of those shareholders "to promote harmony in the business".  The letter was accompanied by the probate court's order rescinding the 1961 transfer.  The letter was accompanied by a few cases that petitioner asserted supported the permissibility of its earnings accumulation.

Petitioner asserts in brief that it also accumulated earnings during the subject years for reasons other than a stock redemption.  Neither petitioner's December 16, 1996, letter nor its pleadings in this case set forth any reason for the earnings accumulation other than a stock redemption.  Nor did petitioner's authorized representative state any other reason when, during petitioner's audit, he responded to the IDR.  In fact, the first time that petitioner asserted that it was also accumulating earnings to meet certain business contingencies and to provide working capital was at or about the time of trial.  Such an after the fact rationalization to support the accumulation of earnings is unavailing.[17]

---

[17] We also find unavailing petitioner's assertion in brief that it was unable to declare dividends during the subject years by virtue of the fact that the family lawsuit placed in doubt the true identity of its shareholders.  The mere fact that the identity of some of the shareholders was being disputed during the subject years does not, to our minds, mean that petitioner was prevented from declaring a dividend.

We focus solely on petitioner's assertion that it was accumulating earnings for a stock redemption and analyze whether this need was: (1) A bona fide reason for the accumulation and (2) a reasonable business need. We decide both prongs of this analysis adversely to petitioner. As to the first prong, petitioner lacked as of the end of each subject year a specific, definite, and feasible plan to use a set portion of its accumulated earnings to redeem part of its stock. The record indicates that: (1) Neither petitioner's officers nor its directors ever discussed in earnest Rubin's suggestion in 1989 that petitioner begin accumulating funds for a possible redemption of the disputed shares, (2) petitioner never considered meaningfully the amount of funds that would be necessary to effect such a redemption,[18] or whether the family lawsuit plaintiffs, given John's testamentary intent, were receptive to a redemption of their shares, and (3) petitioner never undertook a meaningful study of the value of the disputed shares or the likelihood that Emile and Louise would lose the

---

[18] We find incredible Haff's testimony that petitioner needed to retain $10 million as a contingency for the family lawsuit. In this regard, we give no weight to Richard's offer to settle for $20 million his lawsuits against Emile and Louise, individually, and as executors of the wills of John and Emma, or Emile and Louise's counteroffer on July 27, 1990, proposing, in part, to settle Richard's lawsuits by redeeming his shares in petitioner, Haffner Realty, and Fournier Realty for a total payment of $300,000. The counteroffer stated that Richard owned 10 percent of petitioner's nonvoting stock, approximately 10 percent of the nonvoting stock of Haffner Realty, and approximately 6 percent of the nonvoting stock of Fournier Realty.

family lawsuit.  Contrary to petitioner's suggestion, the mere fact that petitioner retained earnings contemporaneously with its controlling shareholder's defense of a lawsuit challenging her right to ownership of ceratin shares constituting a minority interest is not enough to establish the requisite plan under section 1.537-1(b), Income Tax Regs.  Such is especially true here where petitioner's board never formally exercised its judgment to accumulate funds for a planned redemption and where neither petitioner's board nor its officers ever performed an action signifying that petitioner had a specific plan to redeem any of its shares.

As to the second prong, the presence of a reasonable business need, the redemption of the stock of dissenting, minority stockholders is a reasonable business need where the redemption appears necessary to preserve the corporation's existence or to promote harmony in the conduct of the corporation's business.  Wilcox Manufacturing Co. v. Commissioner, T.C. Memo. 1979-92; Farmers & Merchants Inv. Co. v. Commissioner, T.C. Memo. 1970-161.  The dispositive factual consideration in such a situation is whether competing demands among shareholders imperil the very existence of the corporation or the manner in which up to then it has been successfully conducting its business.  Mountain State Steel Foundries, Inc. v. Commissioner, 284 F.2d 737 (4th Cir. 1960).

We decide this factual consideration adversely to petitioner.  Any redemption by petitioner of the family lawsuit

plaintiffs' stock would not have been necessary to prevent competing demands among shareholders from imperiling petitioner's existence or to safeguard the manner in which petitioner had been successfully conducting its business. Instead, the redemption, had it occurred, would have been related to the family lawsuit, an action that was filed against Emile and Louise and in which the plaintiffs never made a claim for damages against petitioner.[19] The mere fact that the family lawsuit centered on ownership of a minority interest in petitioner's stock does not, in and of itself, mean that petitioner's redemption of that stock would be a reasonable business need.[20] Lambert & Associates v. United States, 212 Ct. Cl. 71 (1976). Such is particularly true here where a redemption of those shares would have satisfied the personal obligations of Emile and Louise and where petitioner's operations were never disrupted or compromised during the relevant years as a result of the family lawsuit. In this regard, we distinguish factually the cases of Knight Furniture Co. v. Commissioner, T.C. Memo. 2001-19, Oman Constr. Co., Inc. v. Commissioner, T.C. Memo. 1965-325, and C.E. Hooper, Inc. v. United States, 210 Ct. Cl. 615, 539 F.2d 1276 (1976), relied upon

---

[19] We note that petitioner has acknowledged by virtue of its concession, see supra note 2, that its directors had previously used corporate funds to satisfy a personal liability of Emile and Louise stemming from the family lawsuit. Haff considered the lawsuit to be a personal matter between Richard and Susan, on the one hand, and Emile and Louise, on the other.

[20] Nor do we think that this proposition would be different even if one or more of the plaintiffs were attempting to obtain that minority interest in order to sell it.

by petitioner for a contrary holding as to this issue. We also disagree with petitioner's reading of the above quoted provision of its articles of incorporation to impose upon its board a short time to redeem a shareholder's stock should the board desire to do so. We read nothing in the quoted provision that sets a time limitation on the board's ability to redeem stock.

### 3. Accuracy-Related Penalties

Respondent determined that petitioner was liable for accuracy-related penalties under section 6662(a) and (b)(1) for negligence or intentional disregard of rules and regulations. Petitioner argues that it is not liable for these penalties because it relied reasonably on its accountants' advice in preparing its returns. We agree with petitioner.

As relevant herein, section 6662(a) and (b)(1) imposes a 20-percent accuracy-related penalty on the portion of an underpayment that is due to negligence or intentional disregard of rules or regulations. Negligence includes a failure to attempt reasonably to comply with the Code. Sec. 6662(c). Disregard includes a careless, reckless, or intentional disregard. Id.

A section 6662(a) accuracy-related penalty shall not be imposed to the extent that the taxpayer shows that an underpayment is due to the taxpayer's having reasonable cause and acting in good faith. Sec. 6664(c); secs. 1.6662-3(a), 1.6664-4(a), Income Tax Regs. Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to

the disputed item.  <u>United States v. Boyle</u>, 469 U.S. 241 (1985).
A good faith, reasonable reliance on the advice of an
independent, competent professional as to the tax treatment of an
item may meet this requirement.  <u>Id.</u>; sec. 1.6664-4(b), Income
Tax Regs.

Whether a taxpayer relies on professional advice and whether
such reliance is reasonable hinge on the facts and circumstances
of the case and the law that applies to those facts and
circumstances.  Sec. 1.6664-4(c)(i), Income Tax Regs.  For a
taxpayer to rely reasonably upon professional advice so as
possibly to negate a section 6662(a) accuracy-related penalty,
the taxpayer must prove by a preponderance of the evidence that
the taxpayer meets each requirement of the following three-prong
test:  (1) The adviser was a competent professional who had
sufficient expertise to justify reliance, (2) the taxpayer
provided necessary and accurate information to the adviser, and
(3) the taxpayer actually relied in good faith on the adviser's
judgment.  <u>Ellwest Stereo Theatres, Inc. v. Commissioner</u>, T.C.
Memo. 1995-610; see also Rule 142(a)(1).  The record persuades us
that petitioner has met each of these requirements.  Because
petitioner (through its officers) actually relied in good faith
on its accountants' advice as to the matters at hand, and the
reliance was reasonable, we decline to sustain respondent's
determination as to the accuracy-related penalties.

All arguments in this case have been considered and, to the extent not discussed above, are without merit.  Accordingly,

<u>Decision will be entered</u>

<u>under Rule 155</u>.